LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR. (141757)
THEODORE J. PINTAR (131372)
PHONG L. TRAN (204961)
RACHEL L. JENSEN (211456)
STEVEN M. JODLOWSKI (239074)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jstoia@lerachlaw.com
tpintar@lerachlaw.com
ptran@lerachlaw.com
rjensen@lerachlaw.com
sjodlowski@lerachlaw.com

BARRACK, RODOS & BACINE
STEPHEN R. BASSER (121590)
MARK R. ROSEN (139506)
JOHN L. HAEUSSLER (215044)
402 West Broadway, Suite 850
San Diego, CA  92101
Telephone:  619/230-0800
619/230-1874 (fax)
sbasser@barrack.com
mrosen@barrack.com
jhaeussler@barrack.com

Co-Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re CONSECO INSURANCE CO. ANNUITY MARKETING & SALES PRACTICES LITIG. | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| This Document Relates To: | |
| ALL ACTIONS. | |

No. C-05-04726-RMW
And Related Cases

CLASS ACTION

SECOND AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

1    Plaintiff Robert H. Hansen ("Plaintiff" or "Mr. Hansen"), by and through his attorneys, files

2    this Second Amended Consolidated Class Action Complaint against Conseco Insurance Company,

3    (formerly known as Conseco Annuity Assurance Company) ("CIC"), Conseco Services, L.L.C

4    ("Conseco Services"), Conseco Marketing, L.L.C. ("Conseco Marketing"), 40/86 Advisors, Inc.

5    ("40/86"), and Conseco, Inc. ("Conseco") (collectively referred to as "Defendants") on behalf of

6    himself and all other similarly situated senior citizens who purchased or owned deferred annuity

7    products issued by CIC when they were 65 or older, and were damaged thereby.  Upon information

8    and belief, as well as the investigation of counsel, Plaintiff alleges as follows:

9    **JURISDICTION AND VENUE**

10    1.    This Court has original jurisdiction over the subject matter of this action pursuant to

11    28 U.S.C. §§1331-32 and 18 U.S.C. §1964.  This Court has personal jurisdiction over Defendants

12    pursuant to 18 U.S.C. §1965(b) and (d).  The Court has supplemental jurisdiction over the state law

13    claims pursuant to 28 U.S.C. §1367.  The amount in controversy exceeds $75,000 for the named

14    Plaintiff, exclusive of costs and interest, and includes the loss of annuity benefits and accumulated

15    cash value, the payment of surrender charges, and Plaintiff's pro rata share of punitive damages,

16    injunctive and equitable relief, and attorneys' fees, in which Plaintiff and each Class Member have

17    an individual interest.  Furthermore, the aggregate amount in controversy for this class action

18    exceeds $5,000,000, and less than one-third of all Class Members reside in California.  *See* Class

19    Action Fairness Act ("CAFA"), 28 U.S.C. §1332, Pub. L. No. 109-2, 119 Stat. 4 (2005).

20    2.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (b) because CIC

21    maintains offices, has agents and is licensed to and does transact business in this Judicial District.

22    Venue is also proper under 18 U.S.C. §1965(a) because CIC transacts substantial business in this

23    District.[1]

24

25

26

27    [1]    According to A.M. Best Company's 2005 Report, 21.2% of CIC's direct premiums for all products are earned in California.

28

**PARTIES**

3.      Plaintiff Robert H. Hansen is, and at all times mentioned herein was, a resident and citizen of the State of California, County of Santa Clara.  On August 11, 2000, Mr. Hansen, aged 68 years old at the time, purchased a Conseco Choice equity-indexed annuity issued by CIC.  The Conseco Choice deferred annuity sold to Mr. Hansen contained a maturity date of August 11, 2027, which extended beyond Mr. Hansen's actuarial life expectancy.  While the Conseco Choice contract gave Mr. Hansen the option to reset the maturity date, the contract did not permit resetting the maturing date to a date prior to the expiration of the surrender-charge period.  The Conseco Choice contained a fifteen-year surrender charge period – making August 11, 2017, the earliest maturity date possible under the Conseco Choice contract, which was still beyond Mr. Hansen's actuarial life expectancy.  Additionally, the Conseco Choice imposed a surrender charge of 20% for the first five contract years.

4.      Defendant Conseco, Inc. ("Conseco"), a Delaware corporation, is a financial services company comprised of a group of insurance companies operating throughout the United States that develop, market, and administer annuity, supplemental health insurance, individual life insurance and other insurance products.  Conseco became the successor to Conseco, Inc., an Indiana corporation ("Old Conseco"), in connection with Old Conseco's bankruptcy reorganization.  Conseco maintains its executive offices at 11825 N. Pennsylvania Street, Carmel, Indiana, 46032.  At all times relevant hereto, Conseco, along with its insurance subsidiaries, has focused on serving the senior market, which it views as an attractive, high growth market.

5.      Defendant Conseco Insurance Company ("CIC"), an Illinois corporation, is authorized to, and in fact does, transact substantial business in the State of California and within this judicial district.  CIC is the wholly-owned subsidiary of Washington National Insurance Company, which is ultimately a wholly-owned subsidiary of Defendant Conseco.  CIC maintains executive offices at 222 Merchandise Mart Plaza, Chicago, Illinois, 60654.  Prior to September 2004, CIC was known as Conseco Annuity Assurance Company.  CIC markets and sells a number of insurance products, including deferred annuities, immediate annuities, ordinary and group life insurance, and accident and health insurance.

1    6.    Defendant Conseco Services, L.L.C. ("Conseco Services"), an Indiana corporation, is

2  a wholly-owned subsidiary of Conseco Management Services Company, a Texas corporation, which,

3  in turn, is a wholly-owned subsidiary of Defendant Conseco. Conseco Services maintains its

4  executive offices at 11825 N. Pennsylvania Street, Carmel, Indiana 46032. Conseco Services

5  provides accounting, tax, marketing, actuarial services, asset management, legal, underwriting,

6  policyholder services, regulatory compliance, data processing and other functional support services

7  for Conseco's various subsidiaries and business segments, including the deferred annuity operations

8    7.    Defendant Conseco Marketing, L.L.C. ("Conseco Marketing"), an Indiana

9  corporation, is a subsidiary of Conseco Services. Conseco Marketing maintains its executive offices

10  at 11825 N. Pennsylvania Street, Carmel, Indiana 46032.   Conseco Marketing provides

11  administrative and marketing services to CIC and other Conseco insurance subsidiaries arising out of

12  their agent relationships.

13    8.    Defendant 40/86 Advisors, Inc. ("40/86"), a Delaware corporation, is a wholly-owned

14  subsidiary of Conseco.  40/86 maintains its executive offices at 11825 N. Pennsylvania Street,

15  Carmel, Indiana 46032. 40/86 provides investment and advisory services to CIC and other Conseco

16  insurance subsidiaries.

17                    **FACTUAL ALLEGATIONS**

18  **I.    Defendants' Fraudulent Scheme Targeting Senior Purchasers**

19    9.    In late 1996, Stephen Hilbert, Conseco's then-Chairman of the Board, outlined

20  Defendants' blueprint for capitalizing on the profitable and vulnerable senior market.  Hilbert

21  announced that through a series of acquisitions, Defendants had positioned themselves to become a

22  dominant player in sale of annuities and other insurance products to the senior market.  Hilbert

23  observed that sales of annuities to senior citizens represent "the best marketplace in the industry" and

24  because the senior market is "where the money is."  After several acquisitions in the mid-1990s,

25  Defendants estimated that annuity sales would represent about 40% of all premiums collected.

26    10.    In the following years, Defendants devised and orchestrated a fraudulent scheme to

27  intentionally target vulnerable senior citizens for the sale of CIC deferred annuities.  In furtherance

28  of this scheme, Defendants represent to seniors that the CIC deferred annuities are safe and secure

investments that pay a competitive rate of return. In reality, CIC deferred annuities are illiquid, poorly performing products that are wholly inappropriate investments for senior citizens. To lure elderly purchasers with the false appearance of competitive rates, Defendants employ bait and switch sales tactics involving inflated "teaser" rates that Defendants plan to cut in future years and illusory bonuses that Defendants recoup through lower rates and surrender penalties. Defendants know that CIC cannot and will not maintain the rates used to market and sell deferred annuities to seniors because its ultimate parent, Conseco, systematically siphons enormous sums from CIC through dividends and exorbitant service fees. Defendants fail to disclose numerous adverse material facts about their deferred annuities, thereby misleading senior purchasers on virtually every critical product characteristic, including: (1) product features, cost and performance; (2) investment risk; and (3) illiquidity of investment.

11.     To implement the fraudulent scheme, Defendants associate with corporate affiliates and with independent sales agents who unabashedly target vulnerable seniors for the sale of deferred annuities. Defendants' scheme is especially pernicious because unsuspecting seniors, upon purchasing CIC deferred annuities are effectively locked in – often beyond their life expectancies – due to significant surrender penalties as high as 22%.

**A.     The Conseco Group of Companies**

12.     Defendants are part of a family of insurance, financial, and related companies – all of which are direct or indirect subsidiaries of Conseco. In addition to Defendants, Conseco directs and controls several other insurance and financial services companies, including Conseco Life Insurance Company, Conseco Health Insurance Company, Conseco Senior Health Insurance Company, and Washington National Insurance Company. Conseco refers to its operating subsidiaries, including CIC, as the "Conseco Group." Conseco's insurance subsidiaries sell a variety of products other than deferred annuities.[2]

---

[2]     For example, Conseco Life Insurance maintains a life insurance product portfolio consisting of universal life insurance, equity-indexed universal life insurance, term life, and whole life insurance. Conseco Health Insurance Company and Conseco Senior Health Insurance Company sell healthcare products, such as cancer insurance, Medicare supplements, home health plans, and long

13.     As a holding company, Conseco conducts all of its operations through its wholly owned subsidiaries.  Using its power and control as the ultimate parent corporation, Conseco siphons enormous sums of money from its subsidiaries through dividends, service fees and related party transactions.  Conseco explained its total dependence upon its subsidiaries for infusions of cash and, likewise, the dependence of the various subsidiaries on Conseco's ability to direct and control monetary disbursements should a company need a capital contribution.

> [Conseco] depend[s] on [its] operating subsidiaries for cash to take principal and interest payments on debt and to pay fees for services provided pursuant to service agreements and income taxes.  The cash [Conseco] receive[s] from insurance subsidiaries consists of dividends and distributions, principal and interest payments on surplus debentures, fees for services, tax-sharing payments, and from [its] non-insurance subsidiaries, loans and advances.   A deterioration in the financial condition, earnings or cash flow of the significant subsidiaries of [Conseco] for any reason could limit [its] ability to pay cash dividends or other disbursements to [Conseco].  In addition, [Conseco] may need to contribute additional capital to improve the risk-based capital ratios of certain insurance subsidiaries and this could affect the ability of [its] top tier insurance subsidiary to pay dividends.  Accordingly, this would limit the ability of [Conseco] to meet debt service requirements and satisfy other financial obligations.

Conseco, Inc., Annual Report (Form 10-K) at 29 (March 9, 2007).

14.     Conseco conducts business planning and financial reporting and analysis for members of the Conseco Group in accordance with product segments.  Thus, in evaluating the projected and actual revenues and operating results of CIC and other members of the Conseco Group, Conseco management considers life insurance operations as separate and distinct from the annuity operations.

15.     The subsidiaries comprising the Conseco Group are structured as separate corporations, with ostensible separate existences, to comply with insurance regulations and to reap certain tax and operational benefits.  For example, as alleged in the following paragraphs, affiliates within the Conseco Group provide services to CIC in exchange for the payment of service fees which, in turn, are a revenue source for Conseco.

16.     Conseco Services provides Defendants with accounting, tax, marketing, actuarial services, asset management, legal, underwriting, policyholder services, regulatory compliance, data

term care insurance with Conseco Senior Health focusing solely on sales of these products to senior citizens.  Washington National sells deferred annuities primarily to educators and small employers.

1   processing and other functional support services. Conseco Marketing provides administrative and

2   marketing services to Defendants arising out of their agent relationships.  Other members of the

3   Conseco Group maintain similar service agreements with Conseco Services and Conseco Marketing.

4        17.    40/86 Advisors, Inc. is a fixed income investment advisor and manages over $26

5   billion in public corporate debt securities, taxable municipal bonds, emerging market securities, high

6   yield bonds, government bonds, mortgage related securities, privately placed debt securities,

7   commercial mortgages, bank loans, and CIC's investment portfolios.  These investment activities are

8   critical to the financial health of CIC.  Investment income earned on the spreads between interest

9   yields on investments and rates credited on insurance liabilities is the exclusive source of CIC's

10  profits.  40/86 serves as the chair of the asset/liability committee, which is responsible for, among

11  other things, crediting CIC's interest rates and monitoring its option hedging program for equity-

12  indexed annuities.

13       18.    As alleged more fully below, the structure of the Conseco Group facilitates

14  Defendants' fraudulent scheme and enables Defendants to mask their illegal conduct behind the CIC

15  Enterprise.  The fraudulent practices and criminal conduct of CIC and its affiliates and agents is

16  embedded in the business activities of CIC as a regulated insurance company offering a broad array

17  of insurance products.  Similarly, while CIC holds itself out as a financially sound insurance

18  company that pays competitive rates on its insurance-related products, Conseco and other members

19  of the Conseco Group siphon hundreds of millions of dollars from CIC each year in the form of

20  dividends, excessive service fees and related-party transactions, thereby disabling CIC from paying

21  the attractive rates used to sell deferred annuities to unsuspecting senior citizens.

22       **B.    CIC's Deferred Annuity Products**

23       19.    Annuities pool the risk of living beyond the annuitant's life expectancy.  In contrast to

24  an immediate annuity, a deferred annuity – the type of annuity at issue in this complaint – is an asset

25  accumulation investment product.  Purchasers of deferred annuities select from a limited number of

26  investment options.  For example, Defendants may offer annuitants the option of investing premiums

27  in: (a) an account guaranteeing a fixed minimal rate of interest return; (b) an account whose rate of

28  interest return is dictated by a specific market "index," *e.g.*, Dow Jones Industrial Average or

1    Standard & Poor's Composite Stock Index; or (c) an account which combines and/or blends these

2    two interest accrual methods.[3]  Annuitants expect the value of the account to grow prior to using the

3    accumulated account assets during retirement.  Thus, for an investor to make an informed decision

4    about deferred annuities and their attractiveness in relation to other investment products, it is

5    critically important that the seller and its agents adequately disclose to and inform the investor about

6    all of the features and risks of the annuity, including all material information necessary to understand

7    the applicable product costs, charges, rates of return and penalties.

8         20.    With a deferred annuity, the annuity owner cannot withdraw his or her investment or

9    the earned interest until the holding period expires or the deferred annuity matures, which is usually

10   between 10 and 20 years after the initial payment of the premium.  Annuitants who within the first

11   10-15 years withdraw their initial investment or accrued interest in excess of strict limits incur

12   substantial surrender charges and/or penalties. These penalties and surrender charges, and adverse

13   tax consequences, severely limit elderly annuity owners from meaningful access to their funds.

14        21.    CIC offers a broad range of deferred annuity products.  CIC's annuity portfolio

15   consists of both single and flexible premium, fixed and equity-indexed deferred annuities, which

16   carry maximum issue ages ranging from age 80 to 95 years old.  All of CIC's deferred annuities

17   contain a surrender charge period ranging from 5 to 15 years and starting surrender charges ranging

18   from 8% to 22%.  CIC's equity-indexed deferred annuities account for the majority of the product

19   portfolio and depending on the product will offer anywhere from 2 to 10 crediting options.  CIC also

20   offers a number of fixed and multi-year guaranteed deferred annuities.  Most of CIC's annuity

21   products contain one or more riders, such as the nursing home or terminal illness rider.

22        22.    The CIC deferred annuities are designed to target and exploit seniors.  Conseco

23   specifically addresses its products to the "Middle America Senior Market" and designs its deferred

24   _____

25   [3]      These latter two types of deferred annuities are sometimes referred to in the insurance
     industry as either "equity-indexed" or "multiple-choice" annuities.  However, all of the deferred
26   annuities relevant to this action provide for the repayment of the invested principal amount upon the
     annuity's maturity, together with any earned accumulated interest – which amount is determined by
27   the particular interest accrual vehicle selected by the annuitant at the time of purchase, *e.g.*, fixed,
     equity-indexed, or multi-choice.

28

1   annuities based on the assumption that a majority of its deferred annuities will be sold to senior

2   citizens.  Indeed, CIC intentionally designs its deferred annuities so that agents are authorized to sell

3   them, without restrictions, to seniors ranging from 80 to 95 years old – most often setting the

4   maximum issue age at 85 years old – a presumptive maximum issue age that is substantially higher

5   than the age limit set by other companies in the business of selling deferred annuities.  To promote

6   sales to elderly consumers, CIC also adds worthless "features" to its deferred annuities – such as the

7   so-called Nursing Home Rider, Terminal Illness Rider, and Enhanced Death Benefit Rider – that are

8   attractive to seniors.

9       **C.    Defendants' Misleading Marketing Campaign**

10      23.    Defendants promulgated their deceptive senior deferred annuity sales scheme through

11  uniformly misleading marketing materials that failed to disclose, *inter alia*, numerous material

12  adverse facts making Defendants' deferred annuities are fundamentally inferior and far less valuable

13  to seniors than readily available alternative investment products. Defendants' uniform marketing

14  materials are designed to appeal to vulnerable senior citizens and prey on their fears of risky or

15  insecure investments and living out their retirement years without financial security. Defendants'

16  marketing materials deceptively promote product features purported to be providing security of

17  principle, wealth accumulation through generous returns, liquidity and other attributes that are

18  especially appealing to seniors.  To that end, marketing materials regarding CIC's deferred annuity

19  products encourage Affiliated Agents to state that its annuities offer "tax deferred growth" with

20  "lifetime income" and "no risk of loss," or "growth without risk," and assure that the Annuity

21  product will "give your clients the opportunity to protect their money."  Conseco annuity product

22  point of sale brochures assure seniors that their "money can grow faster in a tax-deferred annuity

23  than other fixed-rated retirement vehicles," that they have "EVERYTHING TO GAIN AND

24  NOTHING TO LOSE," that in "an equity indexed annuity, you can choose to participate in the

25  upper movement of the . . . S&P 500 . . . without the downside risk," and that "credited gains are

26  locked-in."  Seniors are also implored to "make a correct choice for retirement" and assured that

27  CIC's annuities are "backed by the strength of Conseco Annuity Assurance."

28

24.     Because the senior market is a lucrative source of sales for Defendants' deferred annuities, Defendants enlist Affiliated Agents who unabashedly target elderly purchasers.  CIC's products are marketed and sold by independent sales agents affiliated with independent marketing organizations ("IMOs").  CIC has forged relationships with over 250 IMOs and has amassed a sales agent force of over 5000 agents. Defendants' individual sales agents and IMOs who target senior citizens with respect to sales of deferred annuities are collectively referred to herein as "Affiliated Agents."

25.     Many of CIC's top-producing IMOs focus their sales activities on senior citizens and teaching their agents techniques to target senior purchasers.  For example, Broker's Choice of America was a longtime top-producer for CIC.  Broker's Choice was the subject of regulatory proceedings by the Massachusetts Attorney General and the Colorado Division of Insurance arising from its deceptive sales of deferred annuities to senior citizens.  In 2002, a Wall Street Journal exposé documented the abusive sales tactics of Broker's Choice directed at senior citizens, including advising sales agents to treat senior citizens "like they're blind 12-year olds," characterizing senior citizens as making purchases based upon "fear anger and greed," advising agents to dumb-down their explanations about annuities to senior citizens and say "it's like a CD – it's safe, it's guaranteed," and instructing sales agents to use educational seminars for senior citizens during which seminar sales agents should create problems for seniors and "you tease them with the solutions."  Upon information and belief, Broker's Choice recently ceased selling CIC's deferred annuity products.

26.     Defendants contract with other IMOs known for targeting senior citizens for the sale of deferred annuity products.  Some of these IMOs were trained by or affiliated with Broker's Choice.  For example, Dressander & Associates, a top-producing IMO for CIC, recruits sales agents by promoting that they "Need a Partner . . . to be Successful in the Senior Market," and boasting about techniques taught by Dressander for selling to senior citizens.  Another top-producer IMO, Roster Financial, LLC entices prospective agents by stating "[i]t is the money that your senior clients are keeping  . . . that will allow you to supercharge your EIA sales."  Yet another top producer for CIC, Personalized Brokerage Services, advises its agents that "Seniors have money.  Seminars are

king.   Run seminars for Seniors."   Pinnacle Financial Services, Creative Marketing Insurance Company, and The Annuity Store also specifically target the senior market and are or have been consistent top-producing agents for CIC.   The Annuity Store recently co-developed a product with CIC and will receive an additional override from sales of that product.   Defendants and their Affiliated Agents train other Affiliated Agents and individual sales agents to target senior citizens by publicizing financial and estate planning services at seminars and community service events for the elderly.

27.   Defendants instruct Affiliated Agents to begin their sales presentations with financial planning advice even though most Affiliated Agents lack the required license and training to provide competent financial advice to seniors.   Nevertheless, in these targeted solicitations and at estate planning seminars, Affiliated Agents gain the trust of seniors by presenting themselves as expert financial or senior advisors who purport to provide objective investment and financial advice and who purport to possess the special knowledge needed to interpret and understand the complex deferred annuity policies they offer.   As part of Defendants' fraudulent scheme, Affiliated Agents misrepresent that they offer bona fide and objective legal, accounting and financial or estate planning advice, when, in fact, they merely seek to sell deferred annuities trapping seniors in an investment with hidden risks and infirmities, including virtually unfettered discretion to reduce renewal rates to increase CIC's profits while decimating senior Class Members' investment returns. Defendants even provide standardized or approved forms to Affiliated Agents for eliciting confidential and sensitive information about the seniors' assets under the guise of gathering the requisite information for preparing other financial or legal documents.

28.   Defendants train Affiliated Agents to target senior citizens by offering financial or estate planning as community service events for the elderly.   Defendants encourage Affiliated Agents to use these meetings to gain the trust and confidence needed to lure seniors into providing confidential financial information.   Moreover, Defendants' Affiliated Agents target seniors in advertisements for financial, retirement, long-term care, and estate planning seminars and workshops that are publicized in mass mailings and an array of newspapers.   In these targeted solicitations and at the estate planning seminars, Affiliated Agents gain the trust of seniors by presenting themselves

1   as *expert financial advisors* who purport to provide objective investment and financial advice,

2   sometimes under the guise of preparing "living trusts" ("trust mills"), and who purport to possess the

3   special knowledge needed to interpret and understand the complex deferred annuity policies they

4   offer.  The meetings are hosted by Affiliated Agents and held in seniors' homes, hotels, senior

5   centers, houses of worship and other locations.  As part of Defendants' and their Affiliated Agents'

6   scheme, service providers misrepresent that they offer bona fide legal, accounting, and other types of

7   objective advice for financial and/or estate planning, when, in fact, they merely seek to sell the

8   senior a deferred annuity, trapping them into an investment with hidden risks and infirmities,

9   including discretionary pricing vehicles Defendants can and do use to improve its profit and

10  decimate seniors' returns on their investment.

11       29.   Defendants and the Affiliated Agents also promote the marketing and sale of CIC

12  deferred annuities to elderly consumers by sponsoring and participating in events directed to

13  insurance agents and IMOs who target the senior market (including, but not limited to, those

14  identified above).  In addition, Defendants and their Affiliated Agents promote training seminars,

15  employment opportunities and deferred annuity products in publications such as Senior Market

16  Advisor and Life Insurance Selling, which cater to agents targeting senior citizens.  Defendants also

17  facilitate their Affiliated Agents' efforts to target the senior market by providing leads for potential

18  sales to senior citizens.

19      **D.**    **Defendants' Uniform Marketing Materials**

20       30.   Defendants employ a number of measures in order to maintain tight control over the

21  marketing and distribution of their deferred annuity products.  For example, as part of Conseco

22  Marketing's responsibilities under the management services agreement with CIC, Conseco

23  Marketing is responsible for recruiting and contracting with CIC's sales force, including the

24  Affiliated Agents.  Conseco Marketing and the Affiliated Agent enter into a sales agreement.  The

25  sales agreement authorizes the Affiliated Agent to recruit sub-agents and states that if the sub-agents

26  satisfy all requirements, Conseco Marketing will contract with that sub-agent so he or she can sell

27  CIC's products.  Affiliated Agents who recruit additional sub-agents will be entitled to commissions

28

1 based upon the sub-agents' sales.  Conseco Marketing reserves the right to revoke an Affiliated

2 Agent's right to recruit agents.

3       31.    The sales agreement further prohibits any Affiliated Agent from in any way

4 modifying Defendants' forms, policies, procedures, timelines, premiums, credited rates, or making

5 any guarantees regarding current interest rates, the continuance of any practice or procedure

6 currently utilized by CIC without express authorization from Defendants.  Affiliated Agents further

7 agree to ensure that the Affiliated Agents, all employees and sub-agents are trained in accordance

8 with Defendants' standards of market conduct, adhere to Defendants' code of conduct, and are

9 familiar with the conditions of the policies and the supporting marketing literature made available by

10 Defendants.  The sales agreement also requires the Affiliated Agent to agree that "[o]nly material

11 provided by the Company shall be used in soliciting policies."

12       32.    In accordance with Defendants' sales agreement, Defendants provide Affiliated

13 Agents with and require the use of uniform sales and marketing materials.  Defendants uniformly

14 require Affiliated Agents to provide Class Members with a standardized benefit summary and

15 disclosure form and consumer brochure, as well as submit for approval a completed annuity

16 application.  These sales materials, protocols and procedures omit key risks and material adverse

17 information about the deferred annuities, as more fully discussed below.  Defendants instruct the

18 Affiliated Agents not to elaborate on the information presented in its form annuity contracts and

19 uniform pre-printed sales illustrations and marketing materials when making a sales presentation to

20 prospective customers.  Defendants do not disclose certain features of its products to the Affiliated

21 Agents who then, in turn, fail to disclose material adverse information, risks and infirmities to

22 seniors at the point of sale. The benefit summary and disclosure form provided by Defendants

23 includes a summary of the features of the deferred annuity product at issue and contains the

24 Affiliated Agent's verification that he or she did not present information that contradicted the

25 information in the disclosure form.

26       33.    Defendants and authorized representatives provide training to CIC's Affiliated Agents

27 in the form of annuity road shows and other seminars.  However, primary responsibility for the

28 training of CIC's Affiliated Agents is assumed by the IMOs with whom CIC contracts.  Neither CIC

1  nor Conseco Services systematically monitors or audits training received by the Affiliated Agents

2  from outside sources.  Conseco Services on behalf of CIC has contracted with or currently contracts

3  with IMOs and Affiliated Agents which are notorious for promoting their seminars and sales

4  techniques directed at increasing sales to senior citizens.

5       34.    Defendants have a reputation of offering high commissions.  In the past, Defendants

6  have offered commissions as high as 18%.  When Defendants started to lose some of their Affiliated

7  Agents as a result of poor insurance ratings, Conseco and Conseco Services on behalf of CIC began

8  a concerted effort to rebuild CIC's sales force and regain the loyalty of their Affiliated Agents. In

9  order to attract Affiliated Agents back to Defendants, Conseco Services on its own or in conjunction

10 with CIC, third party consultants, or specific Affiliated Agents designed new high-commission

11 products and instituted a number of incentives and perks.  Defendants recognize that agent

12 commission is the driving factor in an agent's decision on which insurance company's products to

13 sell.  Defendants sought to reestablish this reputation by offering commissions ranging from

14 12-15% – well above industry average.

15      35.    In addition to acting as the intermediary between Defendants and senior purchasers,

16 the Affiliated Agents communicate regularly with Defendants and provide input regarding product

17 development, marketing and other affairs.  Affiliated Agents participate in meetings of the Conseco

18 Field Advisory Council to provide input on product development and marketing strategies.

19 Affiliated Agents have participated in the development of products marketed by Defendants and are

20 awarded a national override based upon sales of such co-developed products.  Defendants also

21 revitalized a number of perks and agent initiatives, including offering commission bonuses and

22 sponsoring Annual Sales Conventions held in exotic locations, which agents qualify for by meeting

23 certain production requirements.  In addition, Defendants offered such other perks as trips to NCAA

24 tournaments, gift certificates, NASCAR tickets, sales production trips, points redeemable for prizes,

25 membership in the Winner's Circle, Elite Honors Club, and Pacesetters Club. The Affiliated Agents

26 attend periodic meetings and conferences also attended by top level management of Defendants.

27      36.    By offering these lavish bonuses, rewards, commission and other perks to its

28 Affiliated Agents, Defendants induce, condone and encourage Affiliated Agents to engage in

1    predatory marketing tactics, including targeting and exploiting the vulnerability and concerns of

2    senior citizens.  For example, with the knowledge and at least tacit approval of Defendants, the

3    Affiliated Agents persuade senior citizens to convert their savings or liquidate other investments

4    such as 401ks, 403bs, IRAs, CDs and life insurance policies into their deferred annuities, often

5    resulting in surrender charges incurred for accessing the senior's money after purchase.

6           37.    Defendants' relationship with the Affiliated Agents, who target senior citizens, in

7    combination with Defendants' control over the materials and information disclosed during the sales

8    process, facilitates the scheme to defraud senior citizens by withholding information critical to

9    making an informed investment decision.

10          38.    Conseco's Affiliated Agents adhere to the sales procedures, protocols and materials

11   dictated, prepared and/or approved by Conseco.  These sales protocols and procedures, which

12   include the use of standard annuity marketing materials, illustrations and form contracts created

13   and/or authorized by Conseco, ***omit key risks and material adverse information about the deferred***

14   ***annuities****,* as more fully discussed below.  Conseco instructs the Affiliated Agents not to elaborate

15   on the information presented in its form annuity contracts and uniform pre-printed sales illustrations

16   and marketing materials when making a sales presentation to prospective customers.  Conseco does

17   not disclose certain features of its products to the Affiliated Agents who then, in turn, fail to disclose

18   material adverse information, risks and infirmities to seniors at the point of sale.[4]  As alleged with

19   more specificity below, Defendants also fail to disclose to Affiliated Agents and prospective senior

20   purchasers the Defendants' poor financial condition, which adversely impacts the performance and

21   safety of the deferred products.

22

23

24

_____

25   [4]      Upon information and belief, Conseco has changed its agent training protocols and agent

26   supervision and reporting practices in recent years such that it no longer adheres to statutory
     obligations in selling deferred annuities to seniors.  At the same time, Conseco has increasingly

27   relied on independent agents/brokers and IMOs to market and sell its equity-indexed deferred
     annuities.

28

1    **E.    Defendants' Poor Financial Condition**

2        39.    Between 1982 and 1997, Old Conseco acquired nineteen (19) insurance and related

3    companies and two (2) finance companies.  In 1997, Old Conseco started a concerted effort to

4    establish itself as a brand.  With respect to its annuity sales, these acquisitions established the ground

5    work for the ultimate success of Conseco's scheme to target and profit sales of deferred annuities to

6    senior citizens.

7        40.    Conseco used its many insurance subsidiaries to fund this pattern of exponential

8    growth through acquisitions.  These transactions left the Conseco Group highly leveraged and in a

9    precarious and weak financial condition. From an economic standpoint, the risky ventures of the

10   parent were wildly unsuccessful, particularly the investment in Green Tree Financial, which was a

11   mobile home financing company in poor financial condition when acquired by Conseco, and

12   culminated in Old Conseco seeking protection under Chapter 11 of the U.S. Bankruptcy Code and

13   reorganizing around its insurance operations. Conseco emerged from bankruptcy protection in

14   September 2003.

15       41.    After it emerged from bankruptcy protection, the Conseco Group desired to enhance

16   its financial statements so that it could raise money in the public financial markets as well as regain

17   the confidence of its sales force and customers.  Instead of working to achieve stable financial

18   condition, the Conseco Group continued to engage is questionable financial transactions in order to

19   inflate its balance sheet by hundreds of millions of dollars.  Most of Conseco's subsidiaries,

20   including Defendants, were controlled by substantially the same management group.  Having the

21   same core of decision-makers acting on behalf of the various members of the Conseco Group

22   facilitated the continuation of Conseco's questionable financial practices.

23       42.    This weakened financial condition of the Conseco Group diminished Defendants'

24   ability to pay competitive rates on their deferred annuity products and likewise diminished the safety

25   and security of Defendants' deferred annuity products.  This is especially critical with respect to

26   discretionary rates and aspects associated with Defendants' deferred annuity products, such as

27   renewal rates that are set at levels based upon Defendants' discretion.  These benefits set at the

28   Defendants' discretion are not part of the minimum guaranteed cash value and corresponding reserve

1    calculations so the ability of senior Class Member to receive any of these benefits is completely

2    dependent upon Defendants' financial condition.  In sum, the receipt of benefits under Defendants'

3    deferred annuity products is dependent upon the claims-paying ability of Defendants.

4          43.     Throughout the Class Period, Conseco extracted huge sums of money from CIC to

5    satisfy its own crushing debt obligations to repay principal and interest, dividends on mandatory

6    redeemable preferred stock of subsidiary trusts, holding company expenses, income taxes and

7    investments.  For example, Defendants "upstreamed" monetary payments to their parent entity in the

8    form "dividends" and "service and management" fees to Conseco Services and Conseco Marketing.

9    For example, the following chart illustrates the payment of "upstream dividends" for CIC in years

10   2000 through 2006:

| CIC Year | Dividends | Management Fees | Total |
|---|---|---|---|
| 2000 | $54,225,000 | $150,320,482 | $204,545,482 |
| 2001 | 42,025,000 | 99,118,936 | 141,143,936 |
| 2002 | 36,825,000 | 98,818,611 | 135,643,611 |
| 2003 | 4,361,224 | 23,960,199 | 28,321,423 |
| 2004 | 175,000 | 69,024,299 | 69,199,299 |
| 2005 | 24,824,512 | 61,262,198 | 86,086,710 |
| 2006 | 33,825,000 | 72,442,137 | 106,267,137 |
| **Total** | **$196,260,736** | **$574,946,862** | **$771,207,598** |

16         44.     To maximize Conseco's stock price and their own compensation, Conseco executives

17   sought to maximize the Company's publicly announced earnings per share rather than the returns to

18   annuity holders.  The siphoning of funds from Defendants continues to perpetuate Defendants' weak

19   and potentially unsound financial condition.

20         45.     Defendants' questionable financial condition is further exacerbated by the poor asset

21   quality of Conseco's and correspondingly Defendants' investment, which placed downward pressure

22   on Defendants to adversely alter marketing rates and decimate returns.  Defendants' poor investment

23   asset quality was highlighted in Conseco's 2004 audited financial report, where Conseco designated

24   an investment with an NAIC designation of "4Z" and carrying a value of $65/$100 par.  The proper

25   designation, as reflected in the NAIC Valuation manual was a far lower designation of "6" (in or at

26   default) and carrying a value of only $1/$100 par.  Defendants suffered from poor investment asset

27   quality and the undisclosed adverse financial conditions throughout the alleged Class period.

28

46.     CIC and particularly its deferred annuity operations were further adversely impacted by down-graded ratings by A.M. Best and other rating agencies.  The ratings downgrades have generally caused a decline in sales of Defendants' deferred annuity products and policyholder surrenders and lapses of profitable lines of business to increase.  In some cases, the downgrades have also caused defections among its sales force.  To maintain an effective sales force, Defendants have had to increase the commissions it pays for the sale of its products, institute bonus programs and offer other perks.  These increased costs were ultimately recouped from policyholders.

47.     These events have had a material adverse effect on Conseco Group's financial results. Defendants admitted in recent filings with the SEC that "[f]urther downgrades by A.M. Best of S&P could have further material and adverse effects on our financial results and liquidity."  Thus, even after the bankruptcy, the Conseco Group, including Defendants, remains unprofitable and financially unsound.

48.     The financial condition of Defendants as well as Conseco's other insurance subsidiaries will remain weak and precarious because of the routine practice to transfer money, assets and expenses between the Conseco's various insurance subsidiaries and holding companies. In addition, Conseco's siphoning of funds to pay executives and shareholders as well as the poor-asset quality of investments keep Defendants in perpetually poor financial health and adversely affect the quality and performance of Defendants' deferred annuity products marketed and sold to senior citizens.

**F.     Defendants' Failure to Disclose Critical Information**

49.     To perpetrate their scheme to defraud senior citizens, Defendants intentionally conceal, omit and fail to fully disclose critical information about the attributes and true risks and infirmities of their deferred annuities.  With seniors as the primary target market for their deferred annuities, Defendants develop and use uniform marketing and sales materials that appeal to vulnerable elderly investors and exploit their fears of risky or insecure investments and living out their retirement years without financial security.  In fact, most of Defendants' actuarial manipulations described below are expressly undertaken to allow Defendants to sell deferred annuities to the most elderly Class Members; without those manipulative devices Defendants could

1    not profitably sell deferred annuities to this segment of the market.  Defendants thus target senior

2    Class Members through the actuarial design of their deferred annuity products.

3         50.    Defendants falsely portray their deferred annuities as safe and secure investments that

4    pay a competitive rate of return to senior Class Members.  In reality, Defendants' deferred annuities

5    are illiquid, poorly performing products that are wholly inappropriate investments for senior citizens.

6    To lure elderly purchasers with the false appearance of competitive rates, Defendants employ bait

7    and switch sales tactics involving inflated "teaser" rates that Defendants plan to cut in future years

8    and illusory bonuses that Defendants recoup through lower rates and surrender penalties. Defendants

9    fail to disclose material facts about their deferred annuities, thereby misleading senior purchasers on

10   virtually every critical product characteristic, including: (1) product features, cost and performance;

11   (2) investment risk; and (3) illiquidity of investment.

12        51.    The standardized annuity contracts and uniform marketing and sales materials

13   prepared and disseminated by Defendants are misleading and deceptive and fail to disclose the

14   material facts and information set forth below regarding the costs, performance, risks and infirmities

15   of Defendants' deferred annuity products.   These omitted facts and information relate to the

16   fundamental characteristics of the deferred annuities. Without this information, Class Members are

17   deprived of the ability to make fully-informed purchase decisions. These omitted material facts, if

18   disclosed, would reveal that Defendants' deferred annuities are so inferior to other available

19   investment products and so inappropriate for senior citizens that no fully informed reasonable senior

20   should purchase them.

21            **1.    Product Features, Cost and Investment Performance**

22                 **a.    Undisclosed Commission Costs**

23        52.    In their uniform marketing and promotional materials, Defendants describe the

24   deferred annuities at issue as low cost investment products.  Defendants systematically represented

25   to elderly investors that, unlike mutual funds and other alternate investments, Defendants' deferred

26   annuities have no loads or sales charges.  Defendants intentionally fail to disclose to seniors,

27   however, that Defendants pay exorbitant sales commissions to the Affiliated Agents, often as high as

28   12%-15% of the annuitant's initial principal investment and that these high commissions directly

1   reduce the value of the funds invested on behalf of Class Members. Defendants pay Affiliated

2   Agents additional undisclosed compensation in the form of performance bonuses and overrides, cash

3   bonuses and free trips to exotic locations.  These undisclosed excessive commissions, which are

4   among the highest paid in the annuity industry, impose transactional costs that are exponentially

5   higher than the costs associated with alternate investments such as mutual funds, stock index funds

6   or bonds. In fact, the undisclosed commissions that Defendants pay to the Affiliated Agents

7   generally exceed the maximum sales charge on mutual funds allowed by National Association of

8   Securities Dealers.  Defendants do not disclose to senior Class Members the existence or the amount

9   of the high commissions and other compensation paid to Affiliated Agents.

10       53.    Because Defendants recover the undisclosed agent commission and compensation

11  payments in addition to their internal profit spreads, these excessive sales costs effectively confiscate

12  a substantial portion the seniors' principal investment.  The undisclosed commissions, in turn, result

13  in product features that are particularly detrimental to the senior Class Members, including long

14  surrender periods, extended maturity dates and steep surrender penalties that lock up seniors'

15  investment assets for periods extending far beyond their life expectancies.  Simply stated, the higher

16  the sales commission, the higher the surrender charges.

17       54.    As a direct result of the undisclosed agent commissions, the true effective cost of

18  owning Defendants' deferred annuities is far higher than the costs associated with readily available

19  alternative investments.  Because Defendants do not disclose the true effective cost of owning their

20  deferred annuities (unlike the fully disclosed sales costs and annual expense ratios of a mutual fund

21  or the annual expenses of a variable annuity), senior Class Members are unable to compare the

22  annuities' costs with those of alternative investments, nor can they evaluate the risks and costs

23  associated with Defendants' deferred annuities. For each dollar invested by senior Class Members in

24  one of Defendants' deferred annuities, the Class Member receives an investment worth only 70-80

25  cents. Yet Defendants disclose no facts from which a fully informed senior investor could discover

26  these anemic values.

27       55.    Because Defendants pay commissions and other compensation to Affiliated Agents

28  that greatly exceed the commissions paid to brokers on sales of mutual funds or other investments,

1  the Affiliated Agents have an inherent conflict of interest that precludes them from providing

2  objective, unbiased financial advice to Class Members.  By designing products that pay such above-

3  market commissions, Defendants intentionally motivate the Affiliated Agents to act in their financial

4  self-interest and sell Defendants' deferred annuities rather than better performing alternative

5  investments that pay lower sales commissions.  Indeed, Defendants acknowledge in internal

6  documents that their above-market commissions are the driving force behind Defendants' annuity

7  sales to seniors. Defendants intentionally conceal these conflicts of interest from senior Class

8  Members.

9                    **b.    Undisclosed Subsidies and Teaser Rates**

10        56.    To induce seniors to purchase their deferred annuity products, Defendants employ

11  artificially high "teaser" rates or "subsidies" promising competitive investment returns that will

12  never be delivered to Class Members.  Defendants systematically represent to Class Members that

13  their deferred annuities pay competitive rates and investment returns comparable to or better than,

14  alternative investments.  Defendants fail to disclose that these high initial rates are unsustainable and

15  that Defendants will reduce the rates paid on annuities in future years, thereby diminishing the

16  effective rate of return on the deferred annuities to levels far lower than the returns on readily

17  available alternative investment products.  Defendants issue deferred annuities knowing that, by

18  product design, the initial rates will be lowered in future years for reasons unrelated to prevailing

19  interest rates or the performance of the equity market indices. Even if prevailing interest rates were

20  to remain constant, Defendants must ratchet down the deferred annuities' renewal rates to recoup the

21  initial rate subsidies, earn their targeted profit spreads and recover commissions and other sales

22  costs.

23        57.    Defendants thus use the artificially high "subsidies" and "teaser" rates as a bait and

24  switch sales tactic to lure in senior purchasers.  Defendants know, but fail to disclose, that they

25  cannot afford to maintain the "teaser" rates used to induce annuity sales and that the initial rates

26  therefore misrepresent the returns that Class Members will realize from their investments in deferred

27  annuities.  As alleged above, the Conseco Group was in weak financial condition throughout the

28  Class Period and was entirely dependent on their operating subsidiaries, including CIC, for cash to

1   make principal and interest payments on crushing debt obligations, dividends on preferred stock,

2   operating expenses and executive compensation.  To pay these obligations while maintaining the

3   price of its publicly traded stock, Conseco was forced to siphon funds from its operating subsidiaries

4   through upstream dividends and management fees.  As a consequence, CIC was and is constrained to

5   pay enormous dividends to the Conseco Group and are therefore unable to sustain the artificially

6   high subsidized "teaser" rates used to attract senior annuity purchasers.

7         58.      Unlike other investment products, which pay interest rates fixed by contract or have

8   established market prices, the deferred annuities grant Defendants virtually unfettered discretion to

9   determine the renewal rates and returns paid on the annuities.  Defendants' discretion to reduce

10  renewal rates is limited only by the modest contractual guarantees required by statute, which are

11  lower than the prevailing rates on risk free investments.  Thus, Defendants had the ability to

12  unilaterally ratchet down or reduce the artificially high initial rates offered on their deferred

13  annuities. Defendants were unconstrained by the risk that senior Class Members would cash in their

14  annuities because the Class Members were locked in by the surrender charges and penalties imposed

15  by Defendants' deferred annuities.

16        59.      Defendants reduce or limit increases in the renewal rates on Class Members' deferred

17  annuities, as planned, without disclosing that the initial competitive rates were artificially subsidized

18  "teaser" rates or that the lower renewal rates are driven by Defendants' profit spreads rather than

19  exclusively by prevailing interest rates or the performance of the market indices to which the equity-

20  indexed annuities are linked. Defendants thus lower or throttle the renewal rates on fixed interest

21  annuities and Defendants depress the returns on equity-indexed annuities by manipulating the "index

22  margins," "caps" and "participation rates" limiting Class Members' participation in gains

23  experienced by the applicable equity indices.

24        60.      Apart from Defendants' actions to manipulate the renewal rates and returns on Class

25  Members' deferred annuities, Defendants conceal the true costs and loads of equity-indexed

26  annuities through impenetrable terminology and indecipherable mathematical variables such as

27  "index margins," "caps" and "participation" rates and index averages. Defendants apply these

28  variables, which may be changed from year to year, to credit equity-indexed annuities with only a

fraction of the actual gains in the indexed markets.  Defendants fail to adequately or meaningfully disclose the mechanics of these variables or the manner in which they interact with changes in the equity market indices to determine the actual returns of equity-indexed annuities.

61.    Defendants intentionally obscure and conceal the penalties and true performance of Class Members' deferred annuities through false and misleading headings, indistinguishable text characteristics, confusing verbiage, inconsistent and ambiguous definitions, and "chain" provisions requiring the reader to refer from one provision to another.

### c.    Undisclosed Reductions of Cash Surrender Values

62.    In addition to manipulating non-guaranteed rates, Defendants also manipulate the guaranteed cash surrender values of Class Members' deferred annuities to evade and, in some instances, violate statutes requiring insurance companies to pay certain minimum values to policyholders.  State statutes, generally referred to as the "standard non-forfeiture laws" (or "SNFL"), require companies selling deferred annuities to guarantee that contract owners will receive back all or a specified portion of their premiums, together with a minimum interest rate.  These statutes, which were adopted for the protection of policy owners, operate to restrict the duration and amount of surrender penalties that insurance companies may charge under annuity contracts, by establishing guaranteed minimum cash surrender values. In addition to the SNFL laws, the states have adopted other statutes to protect policy owners by establishing minimum cash surrender values.

63.    Defendants intentionally evade and violate the standard non-forfeiture statutes to disadvantage senior purchasers through lower cash surrender values (and correspondingly higher surrender charges) and longer surrender periods than allowed by law.  Specifically, in order to pay seniors lower minimum guaranteed cash values, Defendants improperly mischaracterize deferred annuity products as flexible premium contracts even though no premiums will be paid after the first policy year. Defendants also mischaracterize their deferred annuities as fixed-maturity products even though Defendants routinely allow maturity dates to be changed.   And Defendants also mischaracterize their deferred annuities as "group" products even though the contracts have no actuarially recognized group characteristics.  Defendants intentionally use these actuarial practices as

1   an artifice to pay lower minimum guaranteed cash values in circumvention of the applicable statutes.

2   By doing so, Defendants intentionally deceive Class Members and state regulators.

3        64.    Defendants mischaracterize the nature of their deferred annuities in regulatory filings

4   in order to pay lower minimum cash surrender values to seniors, thereby allowing Defendants to

5   charge higher surrender penalties and establish lower reserves to increase the amount of surplus that

6   can be "upstreamed" in dividend payments to the Conseco Group.

7        65.    The SNFL require that single premium annuities pay minimum cash surrender values

8   that are at least 90% of the premiums paid by annuity owners.  Flexible annuities, which involve

9   multiple premium payments over time, are not covered by the SNFL but are governed instead by

10  other statutory provisions requiring minimum cash surrender values that are 87 ½ % of the aggregate

11  premiums.

12       66.    Although Defendants know that their deferred annuities are marketed and sold as

13  single premium annuities and assume in product pricing that very few seniors will ever pay

14  additional amounts after the initial premium, they mischaracterize their annuity products as

15  "flexible" premiums in order to pay lower minimum cash surrender values and collect higher

16  surrender charges under annuities sold to senior Class Members.  These reduced cash surrender

17  values – which are 2½% lower than the cash surrender values that would be paid if Defendants

18  properly characterized their deferred annuities – result in correspondingly higher surrender charges

19  having a particularly adverse impact on seniors who have a limited life expectancy and a greater

20  need for access to their assets to pay for medical care, assisted living or nursing care and other life

21  necessities.

22       67.    Another practice employed by Defendants to pay senior Class Members lower

23  minimum cash surrender values than allowed by law involves the classification of certain deferred

24  annuities as "group" contracts.  Because the SNFL do not apply to group insurance products,

25  Defendants improperly characterize various deferred annuities as "group" annuities to evade the

26  minimum cash surrender value requirements of the SNFL.  To be properly classified as a group

27  product, the annuity purchasers must, among other things, share sufficient common characteristics to

28  be an actuarially sound group.  Defendants sell their deferred annuity products without regard to

1   such common characteristics and the purchasers of Defendants' deferred annuities as a group share

2   no such common characteristics.  Defendants' deferred annuities are in reality "individual" contracts

3   that pay minimum cash surrender values lower than the statutory requirement that such values be not

4   less than 90%.

5                    **2.        Investment Illiquidity**

6            68.      Defendants also misrepresent the liquidity of the deferred annuities sold to senior

7   Class Members.  Defendants' deferred annuities are extremely illiquid investments as a result of

8   steep surrender charges lasting for many years.  Defendants' annuities impose surrender penalties

9   lasting as long as 15 years with charges in the early years as high as 22% or more.  As alleged above,

10  senior citizens have a far greater need for access to their assets to pay for medical costs, living

11  assistance and nursing home care.  As such, seniors can ill afford to invest a large portion of their

12  assets in illiquid investments.  Defendants consciously conceal facts that, if disclosed, would reveal

13  that Defendants' deferred annuity products are far more illiquid than senior Class Members are led to

14  believe.

15                   **a.        Excessively Long Surrender Charge Periods**

16           69.      Many of Defendants' deferred annuities contain surrender charge periods that extend

17  far beyond the maximum surrender period for senior citizens permitted by the SNFL.  Defendants'

18  deferred annuity contracts provide cash surrender benefits.  Consequently, the SNFL require that the

19  cash surrender value must be at least equal to present value of the annuity at maturity with maturity

20  defined as no later than 10 years for seniors, discounted at a rate that is 1% higher than the

21  guaranteed rate, discounted to the date of surrender.  In effect, these laws prohibit insurance

22  companies from selling annuities with optional maturity dates from imposing surrender charges

23  longer than 10 years for purchasers who are 70 years of age or older.  Defendants' deferred annuities

24  fail to comply with this prospective statutory test.  Moreover, as alleged below, Defendants also

25  mischaracterize certain deferred annuities as fixed-maturity date products even though Defendants

26  permit changes in the maturity date as a matter of "company practice."  Defendants do so to evade

27  compliance with the SNFL minimum cash value and maximum surrender period restrictions.

28

70.     Defendants' deferred annuities contain surrender periods extending far longer than the 10 year period allowed by the SNFL for seniors and these annuities also impose surrender charge percentages exceeding the maximum percentages allowed by the SNFL.  Defendants intentionally design their deferred annuities with excessive surrender percentages and excessively long surrender periods to allow Defendants to pay and recover the exorbitant sales commissions described above.  Defendants do not disclose to senior Class Members that their deferred annuities contain excessive surrender charges in violation of the SNFL.

### b.     Undisclosed Extended Maturity Dates

71.     The illiquidity of Defendants' deferred annuities is exacerbated by undisclosed extended maturity dates that are often set far beyond the life expectancies of senior Class Members.  Under the deferred annuity contracts, the maturity date is the date when annuitization payments begin.  Defendants establish maturity dates that are far in the future, typically 20 years or more from the contract issuance date.  These extended maturity dates, which reduce the liquidity and flexibility of the annuities, mean that senior Class Members will not be able to receive annuity benefits until they have held the annuities for many years, often at a date that will not occur until after the annuitant's life expectancy.

72.     Many of Defendants' deferred annuities contain a fixed maturity date that the owner may not change.[5]  Defendants' other deferred annuities allow the owner to change the maturity date but prohibit the selection of a maturity date within the surrender charge period.  These restrictions mean that senior Class Members have no contractual right to begin receiving annuity benefits until after they are likely to die or close to their anticipated death.[6]  However, Defendants fail to disclose

---

[5]     Defendants characterize their annuities as fixed-maturity products in order to impose surrender periods longer than the maximum periods allowable for senior purchasers under the SNFL.  This also allows Defendants to pay cash surrender values to senior Class Members that are lower than the required statutory minimums.  Defendants' deferred annuities are not properly classified as fixed-maturity products due to the "company practice" permitting some annuity owners to effectively change the maturity date to receive restricted annuitization benefits.

[6]     As a matter of "company practice," Defendants may permit contract owners to elect to receive annuity benefits at an earlier date.  However, Class Members have no contractual right to

1   the applicable maturity date in their uniform marketing and sales materials or in the disclosure

2   statements that Class Members are required to sign and submit to Defendants.  Rather, this critical

3   information is inconspicuously inserted in the Contract Specifications page of the annuity contract

4   delivered to Class Members after the sale is complete.

5            **c.**      **Hidden Surrender Charges**

6          73.     Although Defendants disclose surrender charge schedules in their deferred annuity

7   contracts and related marketing materials, Defendants fail to disclose other charges that operate to

8   increase the penalties for surrendering the annuity, thereby exacerbating the illiquidity of

9   Defendants' deferred annuities.  Defendants impose hidden charges, fees, and loads affecting the

10   performance of Defendants' deferred annuity products.  For example, Defendants retain 50 basis

11   points per year remaining in the surrender charge period of the annuity owner's proceeds each time it

12   applies a market value adjustment ("MVA") to surrenders or withdrawals from its deferred annuities.

13   Defendants disclose the imposition of the market value adjustment, but do not meaningfully disclose

14   the retention of an extra 50 basis points per year remaining in the surrender charge period on every

15   transaction to which the market value adjustment applies.  Defendants fail to disclose that imposition

16   of the MVA is intentionally skewed in favor of Defendants.   Defendants' claim that the

17   implementation of the MVA provides protection to them against disintermediation risk and enables

18   Defendants to offer higher initial credited rates as a lure to attract additional unsuspecting senior

19   purchasers because the interest rate risk is being passed to the policyholder through the MVA.

20          74.     The undisclosed 50 basis point surcharge per year remaining in the surrender charge

21   period imposed by the MVA has a substantial adverse impact on senior Class Members. Because the

22   MVA is applied to the number of years remaining within the surrender period, the impact of the 50

23   basis point surcharge is magnified and may add as much as an additional 4% to the otherwise

24   applicable surrender charge even if interest rates do not change.  If interest rates increase prior to

25

26

27   early annuitization and Defendants' "company practice" imposes severe restrictions on the annuity
    benefits that Class Members may receive.

28

1   surrender, the annuity owner will pay a far higher additional penalty in addition to the explicit

2   charges disclosed in the surrender charge schedule.

3       75.    Defendants do not credit index amounts until the contract anniversary. This requires

4   Class Members to forfeit all built-up equity gains in the year of surrender or partial withdrawal for

5   any amounts withdrawn on a date other than the exact contract anniversary.

6               **3.      Investment Safety**

7       76.    Defendants portray their deferred annuities as safe and secure investments having no

8   principal or market risk. Defendants also emphasize that the minimum annuity values are

9   "guaranteed." Defendants fail to meaningfully disclose facts that, if disclosed, would reveal that

10  Defendants' deferred annuities actually expose owners to market risk and substantial risk that senior

11  Class Members will lose investment principal.  Defendants also fail to disclose that senior Class

12  Members' investment in Defendants' deferred annuities exposes them to substantial credit risk issues

13  associated with the poor financial condition of the Conseco Group.

14              **a.      The Conseco Group's Poor Financial Condition**

15      77.    As alleged above in paragraphs 39-48, the Conseco Group was in a weakened

16  financial condition throughout the Class Period. Defendants knew, but did not disclose, that they

17  intended to siphon hundreds of millions of dollars in dividends from their subsidiaries, including

18  CIC, to pay the staggering debt load assumed by the Conseco Group in connection with corporate

19  acquisitions and, later, to generate earnings to support the stock price of Conseco, Inc.  Such

20  dividend payments extract surplus that Defendants could otherwise use to fund more generous

21  interest credits and more favorable "index margins" or "caps" on equity-indexed annuities.

22      78.    Defendants also fail to disclose that many of the Conseco Group operating

23  subsidiaries, including Conseco, own assets that are or were impaired, non-performing or of

24  substandard quality.  Defendants also knew, but failed to disclose, that they engineered off-balance

25  sheet and related-party non-arm's length transactions, mergers lacking economic substance and other

26  financial legerdemain among the Conseco Group subsidiaries to artificially prop up their reported

27  financial condition and hide their asset deficiencies.

28

79.     The undisclosed financial problems of the Conseco Group adversely impact the ability of Defendants to maintain renewal rates at competitive levels and create an undisclosed credit risk to senior Class Members.  These financial problems also create the risk, undisclosed to Class Members, that Defendants will be subjected to ratings downgrades or regulatory restrictions that exacerbate Defendants' inability to maintain or pay competitive rates to senior Class Members.

### b.     Principal Risk

80.     Defendants also fail to meaningfully disclose that the interaction of steep surrender charges, partial guarantees and Defendants' virtually unfettered discretion to change renewal rates and equity-index variables place senior Class Members' principal investments at substantial risk.

81.     Defendants' deferred annuities typically do not break even on a contractual basis until many years in the future.  Because the minimum guaranteed cash values are lower than the amount of premiums paid for periods often exceeding the life expectancy of senior purchasers, most senior Class Members will die before their deferred annuity assures them of breaking even.  Consequently, Class Members' principal investments in Defendants' deferred annuities are at substantial risk.

### c.     Market Risk

82.     Defendants' uniform marketing and sales materials represent to prospective purchasers that, unlike other investments, deferred annuities involve no market risk. Defendants do not disclose that senior Class Members actually assume market risk when they purchase Defendants' deferred annuities.

83.     Due to the exorbitant costs associated with Defendants' deferred annuities and the resulting low renewal rates for fixed interest annuities and the restrictions on participation in market gains for equity-indexed annuities, senior Class Members will often fare worse with Defendants' deferred annuities than with a completely risk-free investment.  This risk is exacerbated by Defendants' use of the undisclosed confiscatory MVA formula.

84.     For senior Class Members to receive more than a fraction of what they would receive from a completely risk-free investment, the stock market must increase significantly during the life of the annuities and Defendants must refrain from opportunistically changing the applicable "index margins" or "caps."

85. As a result, not only is senior Class Members' principal investment at risk, it also is subject to significant stock market risk.

**II.  Plaintiff's Individual Transaction**

86. Mr. Hansen, a retired machinist, was induced at the age of 68 to purchase a CIC Equity Indexed Deferred Annuity in August 2000 by Defendants' and Affiliated Agent Zehner's false, deceptive and misleading practices and representations.

87. Previously, in the spring of 1998, Mr. Hansen and his wife attended a seminar given by Mr. Zehner at their church in San Jose, California.  The subject of the seminar was "Living Trusts."  During the seminar, Mr. Hansen and his wife filled out a card enabling Mr. Zehner to come to their home to ostensibly discuss the possibility of preparing a living trust for the Mr. Hansen.  Mr. Zehner thereafter visited with the Hansens at their home.

88. Although Mr. Zehner came to the Hansen family home in 1998 for the purpose of discussing a "living trust," Mr. Zehner quickly turned the Hansens' attention not to a living trust, but to his recommendation and investment advice that Mr. Hansen purchase a deferred annuity.  Mr. Zehner represented that the annuity was "safe," and "risk free."  Mr. Zehner did not disclose the risks and infirmities of the annuity investment he successfully sold to Mr. Hansen, nor did Mr. Hansen ever understand the risks and infirmities of annuity products.

89. In or about August, 2000, Mr. Zehner again met with Mr. Hansen and his wife ostensibly for the purpose of providing financial advice in connection with Mr. Hansen's estate planning.  During this meeting, Mr. Zehner never inquired about or sought information concerning Mr. Hansen's financial or investment assets necessary to determine whether CIC's deferred annuity products were even appropriate for Mr. Hansen's needs.  Instead, Mr. Zehner's focus was ascertaining the degree and extent of Mr. Hansen's pre-existing deferred annuity issued by Security Life Insurance Company ("Security Life") and Mr. Hansen's other liquid assets that could be used to purchase a new CIC deferred annuity.

90. Upon recommending that Mr. Hansen move from the Security Life annuity to a CIC annuity, in August 2000, Mr. Zehner, in an effort to induce Mr. Hansen to purchase an equity indexed deferred annuity, represented, among other things, that the CIC annuity was "safe," and

1   "free of risk" and that Mr. Hansen was "guaranteed" to receive "at least a 3% annual interest return,"

2   on his principal investment, plus capture the benefit of any "increase in the stock market."

3   Defendants' point of sale marketing brochure included uniform statements designed to induce a

4   purchase of CIC's deferred annuity by Mr. Hansen and other Class Members, assuring seniors that

5   they have "EVERYTHING TO GAIN AND NOTHING TO LOSE," that with "…an equity indexed

6   annuity, you can choose to participate in the upper movement of the…S&P 500…without the

7   downside risk," that "credited gains are locked-in" and that "the ***participation rate*** declared at issue

8   is guaranteed for the life of the annuity."  The participation rate was defined as the percentage of the

9   average increase in the S&P 500, minus an "index margin," that will be credited to the purchasers'

10  certificate.  Defendants' marketing materials implored Mr. Hansen to "make a correct choice for

11  retirement" while further comforting him that his investment was safe via an assurance that his

12  annuity was "backed by the strength of Conseco Annuity Assurance."

13      91.    Mr. Zehner's representations and recommendation of the CIC equity-indexed annuity

14  in response to Mr. Hansen's expressed desire to diversity by placing a portion of his assets in no-

15  risk, profitable investments, induced Mr. Hansen to believe that CIC annuity was a more lucrative

16  and better investment than U.S. Treasury securities and that it was both safe and free of any risk.

17      92.    At the conclusion of the meeting, Mr. Hansen surrendered his existing Security Life

18  deferred annuity and used those proceeds - $108,194.24 – as a single premium to secure the purchase

19  of his Conseco Choice Equity Index Flexible Premium Deferred and Fixed Annuity issued by CIC

20  on August 2000 under certificate number CC002509.  Mr. Hansen had been "churned."

21      93.    Once he purchased the annuity, Mr. Hansen was effectively locked in.  At the time of

22  the purchase of his CIC annuity, Mr. Hansen was 68 years of age.  Mr. Mr. Hansen's annuity had a

23  maturity date of August 11, 2027, when Mr. Hansen would be 95, and thus would not mature and

24  begin to distribute the full contracted benefits to Mr. Hansen until long after his actuarial life

25  expectancy – 82 years of age at the time.  The CIC annuity also imposed high surrender charges

26  (20% graduated over the first 15 years of the annuity – through to August 11, 2015) the duration of

27  which would not expire so as to allow Mr. Hansen to freely cash out of or liquidate the policy during

28  his actuarial life expectancy without a penalizing surrender charge.

94.     At the time of the solicitation and sale of the CIC annuity to Mr. Hansen, in August 2000, Mr. Zehner, in addition to being a licensed and appointed agent of CIC, was operating an insurance "trust mill" targeting senior citizens for deferred annuity sales.  Mr. Zehner claimed to specialize in living trusts and held himself out to Mr. Hansen, at all times material, as both an attorney and an investment advisor.  Mr. Zehner developed a relationship of trust and confidence with Mr. Hansen, as did Defendants, and Mr. Hansen reposed his trust and confidence in them. Indeed, ***Defendants acknowledge a relationship of professional "trust and confidence"*** with its product purchasers, and expressly stated to Mr. Hansen, as it has stated to many other CIC annuity consumers and class members:

> Thank you for choosing Conseco Annuity Assurance Company.  You have taken an important step in planning your future, and we appreciate the ***confidence*** and ***trust*** you have shown in making Conseco Annuity a part of your financial program.

Defendants continuously confirmed this relationship of confidence and trust at all times material in its dialogue with purchasers and deployed this proclaimed relationship as a selling point with seniors in an effort to induce their ongoing trust and confidence with respect to their purchase of CIC annuities.

95.     At no time did Mr. Zehner disclose to Mr. Hansen the material risks and infirmities of the CIC equity-indexed annuity investment he was recommending, including its many risks and infirmities, as more fully discussed in Part E above.  The failures to disclose the risks and infirmities of the annuity investment and concealment thereof by both Defendants and Mr. Zehner, induced Mr. Hansen to roll over from the prior annuity into the CIC annuity without his informed consent and without knowledge or appreciation of the material risks and infirmities if his investment.

96.     Failing to disclose the risks and infirmities of annuities is all the more pernicious because, once the annuity is purchased, an owner of the annuity, such as Mr. Hansen, is effectively locked into that investment for a lengthy period of time owing to substantial surrender charges that would be imposed in the event that the purchaser decided to cash out.  This is especially true with regard to senior citizens who, by reason of their age, have serious concerns and liquidity needs, including potentially being required to fund prolonged illness of themselves or loved ones.  Indeed, given Mr. Hansen's age at the time – 68 – and his life expectancy of 14.1 years, Mr. Hansen could

1   not cash out of the policy ***during his life expectancy*** without paying a significant surrender charge.

2   Additionally, Mr. Hansen could not change the maturity date during the 15 year surrender charge

3   period and, consequently, his investment was ***locked up for the remainder of his actuarial life***

4   ***expectancy***.

5         97.    Defendants also suffered from serious, undisclosed adverse financial issues, including

6   the true risks associated with the deferred annuity product when considering Defendants' precarious

7   financial condition and the questionable asset quality of its investments, the intent of Defendants to

8   lower rates in the future regardless of any change in economic conditions, the high sales commission

9   retained by the Affiliated Agent, the ability of Defendants to manipulate the returns through its

10   discretionary power to adjust rates, margins and caps, the overall inferior performance of the

11   product, and the existence of reasonably comparable investment products, which are not riddled with

12   the same defects as Defendants' deferred annuity products.

13         98.    Comparing the values of Mr. Hansen's CIC annuity to an alternative investment such

14   as a treasury bond reveals that the CIC deferred annuity was ***simultaneously more risky and less***

15   ***favorable*** than a treasury bond.  Defendants and Mr. Zehner both failed to disclose this material fact

16   when Mr. Hansen was churned into the CIC product.

17         99.    Mr. Hansen purchased the CIC annuity with the payment of a $108,191.24 premium.

18   At the end of four years he had an account value of $114,457.82.  After a 20% surrender charge this

19   provided a cash value of $91,566.26.  The account value after surrender charge is only $233.08 more

20   than the absolute minimum cash value of $91,333.18.  Hence, at the end of four years from purchase,

21   Mr. Hansen actually had suffered a return of ***negative 4.09%*** with respect to his investment in the

22   CIC annuity.  In comparison, a ten year treasury bond purchased in August 2000 in the principal

23   amount of $108,191.24, plus four years of interest of $6,307.55 per year, or $25,230.20, would have

24   resulted in a total of $133,421.44 for a ***positive return of 5.83%***.  Hence, while Mr. Hansen's CIC

25   annuity had a cash value of $91,566.26 on August 11, 2004 – far less than his initial premium

26   payment – had he invested the $108,191.24 into a ten year treasury bond on August 11, 2000, his

27   treasury investment would have been worth $133,421.44 as of August 11, 2004.

28

1    100.    Indeed, with respect to the "Maximum Index Margin" of Mr. Hansen's CIC annuity

2    used to offset the participation rate, if the relevant index increased 30% and the index "average"

3    went up 15%, the Maximum Index Margin that could be deployed by Defendants in their discretion

4    would nonetheless compute such that the consumer was actually credited with **nothing**.  This

5    exemplifies Defendants' overreaching.  A reasonable investor or consumer would not have

6    understood, recognized or appreciated this when looking at the contract on its face.  In addition, a

7    reasonable investor would not have recognized, understood or appreciated that the methodology used

8    by Defendants respecting the determination of the "average" increase in the index did not have its

9    normal meaning but, instead, allowed Defendants to utilize a less favorable approach such as intra-

10   year averaging, which effectively cutting index performance in half, to the unwitting detriment of

11   senior consumers.

12   101.    Neither Defendants nor Mr. Zehner told Mr. Hansen that even though the CIC annuity

13   was being sold and marketed as a single premium annuity and Mr. Hansen paid a single premium,

14   the annuity's cash surrender values were computed on a "flexible premium" model.  Hence, whereas

15   Mr. Hansen and all other consumers purchasing a single premium annuity should have received an

16   initial cash surrender value of at least 90% of the single premium, by designating the annuity as a

17   "flexible premium," those purchasers' initial cash surrender values were only 80%, rather than 90%,

18   and therefore immediately confiscatory by an additional 10% of Mr. Hansen's and those purchasers'

19   principal investment – a significant reduction.

20   102.    In or about July 2004, as a consequence of learning of bad publicity regarding

21   Defendants' and Mr. Zehner's effort in or about July 2004 to "churn" Mr. Hansen yet again into

22   another annuity, Mr. Hansen cashed-out of the CIC deferred annuity and, as a consequence, suffered

23   substantial surrender charges at that time and was damaged thereby.

24   103.    Had all the risks and infirmities of the CIC deferred annuity been fully and adequately

25   disclosed and affirmatively or otherwise made known to consumers, to enable them to make fully

26   informed investment decisions before purchasing CIC deferred annuities, no reasonable investor

27   would have purchased such annuities instead of selecting or deciding to place his or her assets in

28   other investment products which, in fact, were superior.  Mr. Hansen was induced by the uniform

1  and false representations of Defendants and Mr. Zehner and their uniform material omissions and

2  concealment of material risks and infirmities to purchase Defendants' risky and unsafe investment

3  product.  At no time prior to the liquidation in 2004 did Mr. Hansen know of, or in the exercise of

4  reasonable diligence would he have discovered, the undisclosed and concealed risks and infirmities

5  of his investment, nor would he have purchased the annuity had he been adequately and fully

6  informed of same.

7        104.    Defendants used interstate mail and wire to transmit and receive a variety of materials

8  to effectuate the sale of the Conseco deferred annuity to Plaintiff Hansen.  Defendants also used the

9  mail and wire to process Plaintiff Hansen's deferred annuity application, process the premium

10  payment and pay the commission from the sale of the deferred annuity.

11                              **RICO ALLEGATIONS**

12  **III.    The CIC Enterprise**

13        105.    Defendants are "persons" within the meaning of 18 U.S.C. §1961(3).  Plaintiff and

14  Class Members are each "persons" within the meaning of 18 U.S.C. §1961(3), and each of them has

15  sustained injury to their business or property as a result of the acts and the conduct of Defendants

16  described herein.

17        106.    The following group of individuals associated in fact as an "enterprise" within the

18  meaning of 18 U.S.C. §1961(4) to develop, market and sell CIC's insurance products, including

19  deferred annuities to senior citizens: (a) CIC; (b) Conseco Services and its affiliate, Conseco

20  Marketing; (c) 40/86 Advisors; (d) Conseco; and (e) the Affiliated Agents. This association in fact is

21  referred to herein as the "CIC Enterprise" or the "Enterprise."  As alleged more fully in the

22  following paragraphs, the CIC Enterprise has an ascertainable and hierarchical decision-making

23  structure, an ongoing and continuous existence that is separate from the alleged pattern of

24  racketeering activities and members who have existences and activities that are separate and distinct

25  from those of the Enterprise.

26        **A.    Ascertainable Structure**

27        107.    The CIC Enterprise is an ongoing and continuing organization of corporations and

28  individuals associated for the common or shared purpose of marketing and selling CIC's insurance

1  products. Each member of the CIC Enterprise has a clearly defined role in the affairs of the
2  Enterprise.

3       •      CIC designs deferred annuity products, disseminates uniform marketing materials for
4              those products, directs the activities of the Affiliated Agents and collects the
5              proceeds of the Enterprise.

6       •      Conseco Services provides operational, administrative and management services for
7              the Enterprise and controls the finances and operations of the Enterprise. Conseco
8              Services also allocates income illegally obtained from the affairs of the CIC
9              Enterprise among the members of the Conseco Group. Indeed, because CIC has no
10             employees of its own, Conseco Services performs virtually all of the business
11             functions for CIC and the Enterprise.

12      •      Conseco Marketing contracts with the Affiliated Agents and produces sales and
13             marketing materials used by members of the Enterprise.

14      •      40/86 performs investment advisory services for the Enterprise, including acquisition
15             of the assets purchased with the annuity proceeds collected from senior Class
16             Members, determination and execution of the option hedging strategies for equity-
17             indexed annuities and participation in the rate-setting process for CIC deferred
18             annuities.

19      •      The Affiliated Agents market and sell CIC's deferred annuities to senior citizens
20             throughout the United States. In addition to their marketing and distribution
21             activities, the Affiliated Agents participate in the design of certain CIC deferred
22             annuity products and provide input into the features of CIC's deferred annuities and
23             its annuity operations.

24      108.   There is a strict hierarchical operating and decision-making structure governing the
25  activities of the CIC Enterprise.  CIC has no employees; instead, Conseco Services provides all
26  operational, actuarial, marketing, administrative, compliance, legal and management functions for
27  CIC.  Conseco Services makes all major business and financial decisions for CIC, including those
28  associated with the affairs of the CIC Enterprise.

109.   A small core of executives at Conseco Services controls the financial affairs of the Enterprise and the decisions made by those executives are implemented, in a hierarchical fashion, by CIC. Conseco Services conducts business and strategic planning for CIC, including its annuity operations.  The assets and proceeds of the CIC Enterprise are controlled by Conseco Services and these assets and proceeds are routinely allocated and transferred (in the form of dividends, capital contributions, mergers and reinsurance transactions) among various Conseco subsidiaries by Conseco Services. Likewise, Conseco Services directs CIC to engage in asset acquisitions, reinsurance transactions and other related-party transactions involving other members of the Conseco Group.

110.   The members of the CIC Enterprise share many common officers.  Thus, for example, during the Class Period, Kenneth Lowell Short, Ron Ruhl, James Crafton and Dennis Taylor served simultaneously as key executive officers for the Conseco members of the Enterprise – CIC, Conseco Services, Conseco Management and Conseco.  This small core of common executive officers, together with other operating officers such as William Shea, Tom Blackburn, Brad Corbin, and Randy Woock, direct and control the affairs of the Enterprise through periodic meetings, planning sessions, budgeting and business plans and ongoing communications.

111.   In addition, as part of the Enterprise's hierarchical decision-making structure, CIC and Conseco Marketing direct and control the activities of the Affiliated Agents through formal agency contracts, compliance rules and written policies and procedures.  As part of Conseco Marketing's responsibilities under the management services agreement with CIC, Conseco Marketing is responsible for recruiting and contracting with CIC's sales force, including the Affiliated Agents.  Conseco Marketing and the Affiliated Agents enter into standardized sales agreements.  The sales agreement authorizes the Affiliated Agent to recruit sub-agents and states that if the sub-agents satisfy all requirements, Conseco Marketing will contract with that sub-agent so he or she can sell CIC's products.  Affiliated Agents who recruit additional sub-agents are entitled to commissions based upon the sub-agents sales.

112.   The sales agreement further prohibits any Affiliated Agent from in any way modifying CIC's forms, policies, procedures, timelines, premiums, credited rates, or making any

1    guarantees regarding current interest rates, the continuance of any practice or procedure currently

2    utilized by CIC without express authorization. Affiliated Agents further agree to ensure that the

3    Affiliated Agent, all employees and sub-agent are trained in accordance with CIC's standards.

4        113.   Defendants provide Affiliated Agents with and require the use of uniform sales and

5    marketing materials. Defendants instruct the Affiliated Agents not to elaborate on the information

6    presented in its form annuity contracts and uniform pre-printed sales illustrations and marketing

7    materials when making a sales presentation to prospective customers.  The sales agreement also

8    requires the Affiliated Agent to agree that "[o]nly material provided by the Company shall be used."

9    CIC retains authority to review and approve all marketing materials used by the CIC Affiliated

10   Agents and to audit the agents' books and records.  CIC also determines agent compensation and

11   requires agent training and internal compliance procedures.

12       114.   CIC and Conseco Marketing communicate regularly with the Affiliated Agents by

13   disseminating policies and procedures, product information and other information on an ongoing

14   rather than *ad hoc* basis through product materials, web postings, emails and internal publications.

15       115.   CIC and Conseco Marketing direct the Affiliated Agents in their activities in a

16   hierarchical fashion by requiring the sales agents to follow their directives in the marketing and sales

17   of their annuity and insurance products, including the requirement that all written statements or

18   materials given to prospective purchasers of these deferred annuity products must receive advance

19   approval from CIC. Defendants exercise substantial control over the direction of the CIC Enterprise

20   by, *inter alia*:

21           (a)    designing and issuing annuity and insurance products offered for sale to

22   consumers throughout the United States;

23           (b)    designing and distributing marketing and sales materials describing the

24   features of Defendants' annuity and insurance products;

25           (c)    developing uniform sales and marketing materials, standardized contracts,

26   and uniform sales techniques and  presentations including, but not limited to, those materials

27   developed by Defendants for use by the Affiliated Agents;

28

1    (d)    instructing and requiring Affiliated Agents to use standardized sales materials,

2  uniform sales techniques and presentations developed and/or authorized by Defendants;

3    (e)    rewarding sales agents with perks and high commissions for selling

4  Defendants' annuity and insurance products; and

5    (f)    accepting applications for, and issuing annuity and insurance contracts, that

6  mature after the actuarial life expectancy of the annuitant.

7    116.    The Affiliated Agents, in turn, participate in the decision-making structure of the CIC

8  Enterprise in an ongoing fashion through their membership in numerous councils and committees

9  established by Defendants.  Affiliated Agents associated with CIC participate in meetings of the

10  Conseco Field Advisory Council to provide input to Defendants on product development and

11  marketing strategies. More recently, Affiliated Agents have participated in the decision-making

12  affairs of the Enterprise through membership in the President's Council. Top-producing Affiliated

13  Agent IMO's are invited to become members of the President's Council to develop new products,

14  compensation policies and marketing programs.    Affiliated Agents also participate in the

15  development of products in conjunction with CIC and are awarded national override compensation

16  based upon sales of such co-developed products.  Likewise, Affiliated Agents participate in the

17  decision-making process as members of the Winner's Circle, Elite Honors Program, Pacesetter's

18  Club, President's Honor Circle, and participation in the Annual Sales Convention.

19    **B.    Continuous Existence**

20    117.    The CIC Enterprise has had an ongoing and continuous existence during the Class

21  Period.  Throughout the Class Period, the members of the CIC Enterprise associated in fact to market

22  and sell CIC's products. Defendants developed and marketed a continuous stream of annuity and

23  insurance products sold through the Affiliated Agents. Likewise, the Affiliated Agents associated

24  with the Enterprise on an ongoing rather than ad hoc basis.  The Affiliated Agents marketed Conseco

25  annuity and insurance products to consumers on an ongoing basis each year during the Class Period,

26  they participated actively in the affairs of the Enterprise as members of committees and groups on an

27  ongoing basis and they have engaged in joint marketing and promotional activities on an ongoing

28  and continuous basis.

118.   The CIC Enterprise has displayed a continuity of membership during the Class Period.  CIC, Conseco Services and Conseco have acted continuously in their leadership roles in the Enterprise, Conseco Management and 40/86 Advisors have provided services to the Enterprise throughout the Class Period and there has been a stable network of Affiliated Agents participating in the Enterprise year after year.

**C.   Separate Existence**

119.   As alleged more fully below, Defendants have conducted affairs of the CIC Enterprise through a pattern of racketeering activity.  Defendants and their co-conspirators intentionally conceal, *inter alia*, that CIC's deferred annuities: (1) impose hidden and inflated charges and expenses that tie up seniors' assets beyond their expected life span and prevent them from access to funds needed for health and medical care and living expenses; (2) are poorly performing investments that will experience declining returns because CIC lures senior purchasers through inflated initial "teaser" rates that Defendants intend to reduce in future years; and (3) carry substantial undisclosed principal and market risk and other risks resulting from CIC's unsound financial condition.  As a direct result of this conspiracy and fraudulent scheme, Defendants were able to extract excessive premiums, fees, early withdrawal penalties, and other revenues from Plaintiff and the Class.

120.   The CIC Enterprise, and each of its members, exists independently from the racketeering activities of the Enterprise.  Each member of the CIC Enterprise has an existence separate from their participation in the racketeering activities of the Enterprise.  CIC, Conseco Services, Conseco Management and Conseco are organized and operated as separate corporations with separate Boards, separate books and records, separate accounts and separate existences for legal and regulatory purposes.  In addition to the deferred annuities sold to seniors by the Enterprise, CIC markets other insurance products including life insurance, disease insurance and Medicare supplement insurance.  Likewise, CIC sells insurance products to middle-income customers who are not senior citizens.  Also, as alleged below, the Affiliated Agents sell or are authorized to sell CIC insurance products other than deferred annuities and they also sell CIC deferred annuities to customers who are not senior citizens.

121.    The CIC Enterprise also has an existence and structure that is separate and distinct from other affairs of its members. Members of the CIC Enterprise engage in legitimate business operations separate and apart from their activities on behalf of the Enterprise.

- In addition to providing operational, administrative and management services utilized by the Enterprise, Conseco Services provides similar services to other companies within the Conseco Group having no relationship to the CIC Enterprise. For example, Conseco Services provides all operational, administrative and management services for Conseco Life Insurance Company (which maintains a life insurance product portfolio consisting of universal life insurance, equity-indexed universal life insurance, term life, and whole life insurance), Conseco Health Insurance Company and Conseco Senior Health Insurance Company (which sell healthcare products, such as cancer insurance, Medicare supplements, home health plans, and long term care insurance) and Washington National Life Insurance Company (which sells life insurance products and deferred annuities primarily to educators and small employers).

- Conseco Marketing likewise provides marketing services and 40/86 provides investment advisory services to other members of the Conseco Group that are not part of the CIC Enterprise.  40/86 also provides investment services to entities unrelated to Conseco or any of its subsidiaries.

- The Affiliated Agents sell many insurance products other than CIC deferred annuities. These other products, unrelated to the Enterprise, include life insurance, long term care insurance, supplemental insurance, specified disease insurance, and accident and health insurance.  Moreover, because they operate as independent agents, the Affiliated Agents sell insurance and annuity products issued by many companies other than CIC.  The Affiliated Agents also provide financial advice and conduct seminars and sales activities that are wholly unrelated to the CIC deferred annuities or the affairs of the Enterprise.

122.     Many activities engaged in by the members of the CIC Enterprise in furtherance of the racketeering activities are not ordinary legitimate business activities and, in fact, would be inimical to the interests of the Enterprise members if detected by regulatory or law enforcement officials.  The Affiliated Agents' activities in conjunction with fraudulent and abusive "trust mills" and estate planning seminars, their use of bogus financial or estate planning "designations" to sell deferred annuities to seniors under false pretenses and their actions to falsely portray themselves as objective financial planners, while concealing that they are actually insurance agents, are not the regular business activities of legitimate insurance companies.  Where such practices have been detected, insurance regulators and attorneys' general have revoked the licenses of sales agents and have initiated enforcement actions against IMOs and insurance companies selling deferred annuities.  Likewise, CIC's actions circumventing insurance regulations to prey upon senior citizens, as alleged above, are not ordinary business activities of a legitimate insurance company.

123.     The Affiliated Agents, on behalf of the Enterprise, employed CIC and the "Conseco" brand to lend an air of legitimacy to their own illicit practices.  And by utilizing the IMO Affiliated Agents rather than its own employees to sell deferred annuities to senior citizens, CIC gained additional power to perpetrate the fraudulent scheme; CIC was able to reap the enormous profits generated by the agents' abusive sales practices while, at the same time, insulating itself from the agents' pernicious conduct by invoking their status as "independent" marketing organizations.  In this manner, the members of the CIC Enterprise functioned together to magnify their potential for misconduct, the prototypical activities that the RICO statutes are designed to redress.

124.     The involvement of separate corporations and entities in the CIC Enterprise provides a separate, ascertainable structure to the Enterprise.  In addition, because the members of the CIC Enterprise perform activities on behalf of the association-in-fact that are separate from the alleged racketeering activities, including the sale of Conseco products other than deferred annuities to customers who are not seniors, the Enterprise also has an existence separate from the alleged racketeering activities themselves.  Also, because each of the members of the CIC Enterprise engages in separate lawful activities apart from their activities on behalf of the Enterprise, each of them has a separate existence that extends beyond the Enterprise and beyond the alleged

1   racketeering activities themselves.  Furthermore, because the members of the CIC Enterprise engage

2   in conduct on behalf of the Enterprise that are not lawful or regular business activities, the

3   racketeering activities of the Enterprise are not simply the normal business activities of CIC.  For all

4   of these reasons, the CIC Enterprise has an ascertainable and continuing existence that is separate

5   from the racketeering activities themselves and the alleged racketeering activities of the Enterprise

6   are not co-extensive with the ordinary business of CIC.

7   **IV.     Interstate Commerce**

8           125.    The CIC Enterprise functions, in part, by deceiving senior citizens concerning the

9   nature and objectivity of the services rendered by persons acting on behalf of the CIC Enterprise.

10  Persons acting on behalf of the CIC Enterprise seek to disarm senior citizens and unfairly gain their

11  trust by offering to provide objective and disinterested financial, long-term care or estate planning,

12  consultation, advice and related services, as well as deferred annuity products.  If truly objective and

13  disinterested, and if not used as a ruse to promote and effectuate the sale of these deferred annuity

14  products, many of these services and products could be legitimate and non-fraudulent.  However,

15  Defendants and their co-conspirators, through the CIC Enterprise, have engaged in a pattern of

16  racketeering activity which also involves a fraudulent scheme to increase premium revenue for

17  Defendants, additional revenue for the Affiliated Agents from commissions, through the sale of CIC

18  deferred annuities to senior citizens through fraudulent misrepresentations and omissions.

19          126.    The CIC Enterprise engages in and affects interstate commerce because it involves

20  activities across state boundaries, such as the marketing, promotion, advertisement and sale of

21  inappropriate deferred annuity products to seniors, and the receipt of premiums, commissions, and

22  surrender charges from the sale of inappropriate deferred annuity products to senior citizens.

23          127.    At all relevant times, each participant in the CIC Enterprise was aware of the scheme

24  to sell seniors inappropriate deferred annuity products, was a knowing and willing participant in the

25  scheme and reaped profits therefrom.

26  **V.      RICO Conspiracy**

27          128.    Defendants and the Affiliated Agents have not undertaken the practices described

28  herein in isolation but as part of a common scheme and conspiracy.

1    129.    Defendants and the Affiliated Agents have engaged in a conspiracy to increase or

2    maintain market share and premium revenue for Defendants, and to generate additional revenue for

3    Affiliated Agents through high commissions and incentives paid by Defendants for selling deferred

4    annuities to senior citizens.

5    130.    The objects of the conspiracy include: (a) to sell CIC's deferred annuity policies to

6    seniors; (b) to maximize annuity sales for Defendants; (c) to maximize commissions for Affiliated

7    Agents; and (d) to maximize the revenues of Defendants, and the Affiliated Agents.

8    131.    Defendants and each member of the conspiracy, with knowledge and intent, have

9    agreed to the overall objectives of the conspiracy and participated in the common course of conduct

10   to commit acts of fraud and indecency in gaining the trust of elderly citizens, persuading them to

11   consolidate their assets in a deferred annuity, and to solicit, market and sell such policies to persons

12   for whom the investment will provide no benefit, but rather, will cause them harm through steep

13   penalties, complications for loved ones upon their death, tax liability and other costs and expenses.

14   132.    Indeed, for the conspiracy to succeed, Defendants and their co-conspirators had to

15   agree to implement and use the similar devices and fraudulent tactics against their intended targets.

16   Many instances of common conduct, activity and similar facts evidence the presence of a conspiracy

17   and exist among Defendants and their co-conspirators including, but not limited to:

18   (a)    similar advertisements and marketing materials with material omissions

19   and/or vague, misleading, and incomplete language about the adverse material features and key risks

20   of CIC deferred annuities;

21   (b)    similar plans and methods for sales agents to solicit, market, refer, and sell

22   CIC's deferred annuities under the guise of providing financial and estate planning for seniors;

23   (c)    similar tactics for steering the class to CIC deferred annuity policies; and

24   (d)    similar agreements between and among Defendants and their co-conspirators

25   to sell deferred annuity products to seniors, despite industry standards and governmental warnings.

26   133.    As a result of the conspiracy, Plaintiff and the Class made payments for deferred

27   annuity products and other "services" beyond what they would have otherwise.

28

1  **VI.    Predicate Acts**

2         134.    Section 1961(1)(B) of RICO provides that "racketeering activity" includes any act

3  indictable under 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire

4  fraud).  As set forth below, Defendants have engaged and continue to engage in conduct violating

5  each of these laws to effectuate their scheme.

6         **A.    Violations of 18 U.S.C. §§1341 and 1343**

7         135.    For the purpose of executing and/or attempting to execute the above-described

8  scheme to sell the challenged deferred annuities to senior citizens by omitting material information

9  regarding the critical attributes and risks of the deferred annuity products, which if disclosed, would

10 reveal these deferred annuity products to be inferior to alternative investments, Defendants, in

11 violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories matter and

12 things to be sent or delivered by the Postal Service, caused matter and things to be delivered by

13 commercial interstate carriers, and received matter and things from the Postal Service and/or

14 commercial interstate carriers, including, but not limited to, deferred annuity marketing brochures,

15 annuity disclosure forms, performance illustrations, applications, contracts, training manuals, video

16 tapes, correspondence, annuitant leads lists, premium and commission payments, reports, data,

17 summaries, statements and other materials relating to the marketing and sale of Defendants' deferred

18 annuities.

19        136.    For the purpose of executing and/or attempting to execute the above-described

20 scheme to defraud or obtain money by means of false pretenses, representations or promises,

21 Defendants, also in violation of 18 U.S.C. §1343, transmitted and received by wire, matter and

22 things, which include, but are not limited to, consumer brochures, annuitant applications, annuity

23 disclosure forms, field memos, correspondence, prospective lead lists, premium and commission

24 payments, reports, data, summaries, account statements, faxes and other deferred annuity materials.

25 In addition, pursuant to and as part of the scheme to defraud, Defendants intended to and did receive

26 payments from Plaintiff and other Class members that were transmitted or cleared through the use of

27 interstate wires in violation of 18 U.S.C. §1343.  Defendants aided and abetted violations of the

28

1  above laws, thereby rendering them indictable as a principals in the 18 U.S.C. §§1341 and 1343

2  offenses pursuant to 18 U.S.C. §2.

3      137.   Many of the precise dates of Defendants' fraudulent uses of the U.S. Mail and wire

4  facilities have been deliberately hidden and cannot be alleged without access to Defendants' books

5  and records.  Indeed, the success of Defendants' scheme depends upon secrecy, and Defendants have

6  withheld details of their scheme from Plaintiff and class members.  Generally, however, Plaintiff can

7  describe the occasions on which the predicate acts of mail and wire fraud would have occurred, and

8  how those acts were in furtherance of a scheme.  They include thousands of communications to

9  perpetuate and maintain the scheme, including, among other things:

10        (a)   processing applications for deferred annuity products;

11        (b)   processing premium payments from senior citizens;

12        (c)   paying and receiving commissions for the marketing, referral and sale of

13  deferred annuity products to a senior;

14        (d)   transmitting and receiving materials about Defendants' and their Affiliated

15  Agents' financial and estate planning seminars, workshops and other similar events for senior

16  citizens;

17        (e)   disseminating training materials for selling deferred annuities;

18        (f)   sharing information about prospective senior citizen purchasers of deferred

19  annuities; and

20        (g)   imposing and processing penalties and surrender charges for early access to

21  funds trapped in the deferred annuity products.

22      138.   The materials sent or received by Defendants via the U.S. Mail, commercial carrier,

23  wire or other interstate electronic media, contained, *inter alia*:

24        (a)   omissions about the key risks and features of CIC deferred annuities,

25  including Defendants' poor financial condition, risk to principal, and other market risks;

26        (b)   omissions about the significant commissions, sales loads and expenses,

27  subsidies, teaser rates, and historical and investment yields associated with CIC deferred annuities;

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - C-05-04726-RMW And Related Cases    - 45 -

1        (c)     omissions regarding reductions to the cash surrender value of CIC's deferred

2  annuity products;

3        (d)     false or misleading representations that the Affiliated Agents provide

4  objective financial advice to assist the class in crafting their financial and estate plans;

5        (e)     omissions about the inappropriateness of deferred annuity policies for seniors,

6  as well as the drawbacks of such policies, such as illiquidity of CIC's deferred annuities, steep

7  penalties for withdrawal prior to the maturity date, extended maturity dates, and other hidden

8  surrender charges;

9        (f)     materials failing to disclose the existence and effect of commissions paid to

10  Affiliated Agents by Defendants, including the conflicts of interest created by the payments and as

11  part of the conspiracy; and

12        (g)     invoices and payments related to Defendants' and Affiliated Agents' improper

13  scheme.

14      139.    Defendants' corporate headquarters have communicated by U.S. Mail and by

15  facsimile with various regional offices and subsidiaries, divisions and other insurance entities in

16  furtherance of their scheme with the Affiliated Agents.

17      140.    Defendants' omissions of material facts, acts of concealment and failures to disclose

18  were knowing and intentional, and made for the purpose of deceiving Plaintiff and the Class, selling

19  lucrative deferred annuity policies, and entitling the Affiliated Agents to high commissions from

20  Defendants.

21      141.    Defendants and their co-conspirators either knew or recklessly disregarded the fact

22  that their omissions and misrepresentations were material and were relied upon by Plaintiff and the

23  Class as shown by their payments for deferred annuity policies placed with Defendants, as well as

24  other fees for financial planning advice.

25      142.    Plaintiff and the Class relied, to their detriment, on Defendants' fraudulent material

26  omissions and misrepresentations, which were made by means of Web sites, mass mailings,

27  newspaper advertisements, telephone calls, marketing materials and virtually uniform

28

1  representations or omissions.  Plaintiff's and the Class' reliance is evidenced by their payments made

2  for services and for insurance products to Defendants.

3         143.   Defendants knew Plaintiff and the Class relied on their misrepresentations and

4  omissions about the pricing and advantages or disadvantages about certain insurance policies and/or

5  insurance carriers.  Defendants knew that annuitants would incur substantial cost as a result.

6         144.   As a result, Defendants have obtained money and property belonging to the Plaintiff

7  and Class Members, and Plaintiff and the Class have been injured in their business or property by

8  Defendants' overt acts of mail and wire fraud, and by their aiding and abetting each other unnamed

9  co-conspirator's acts of mail and wire fraud.

10 **VII.    Pattern of Racketeering Activity**

11        145.   Defendants have engaged in a "pattern of racketeering activity," as defined by 18

12 U.S.C. §1961(5), by committing or aiding and abetting in the commission of at least two acts of

13 racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§1341 and 1343 as described above,

14 within the past ten years.  In fact, Defendants have committed or aided and abetted in the

15 commission of countless acts of racketeering activity.  Each racketeering act was related, had a

16 similar purpose, involved the same or similar participants and method of commission, had similar

17 results, and impacted similar victims, including the Plaintiff and other members of the Class.

18        146.   The multiple acts of racketeering activity that Defendants committed and/or conspired

19 to, or aided and abetted in the commission of, were related to each other and amount to and pose a

20 threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity"

21 as defined in 18 U.S.C. §1961(5).

22 **VIII.   RICO Violations**

23        147.   Section 1962(c) of RICO provides that it "shall be unlawful for any person employed

24 by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

25 commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs

26 through a pattern of racketeering activity…."  Through the pattern of racketeering activities outlined

27 above, Defendants have conducted and participated in the affairs of the CIC Enterprise.

28

148.    Defendants willfully agreed to, and did, materially participate, directly or indirectly, in the conduct or the affairs of the CIC Enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud, and so participated in violation of 18 U.S.C. §1962(c).

149.    Additionally, Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  In violation of 18 U.S.C. §1962(d), Defendants conspired with their Affiliated Agents to violate 18 U.S.C. §1962(c) as described herein.  Various other persons, firms and corporations, not named as defendants in this Complaint, have participated as co-conspirators with Defendants, and its Affiliated Agents in these offenses and have performed acts in furtherance of the conspiracy.

150.    Plaintiff and the Class have been injured in their property by reason of Defendants' violations of 18 U.S.C. §§1962 (c) and (d), including lost access to needed funds, unnecessary and concealed fees, charges and penalties that they would not have otherwise incurred, expenses to hire a financial planner and/or attorney and lost value in previous investments that they would not have otherwise incurred.  In the absence of Defendants' violations of 18 U.S.C. §1962(c) and (d), Plaintiff and the Class would not have incurred these costs and expenses, or they would have incurred less.

151.    The injuries of Plaintiff and the Class were directly and proximately caused by Defendants' racketeering activity.

**FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING**

152.    Defendants have affirmatively and fraudulently concealed its unlawful scheme, conspiracy and course of conduct from Plaintiff and the Class.  Plaintiff and other Class Members did not know, and could not reasonably have known, of Defendants' fraudulent scheme and could not have reasonably discovered the falsity of Defendants' representations, advertising and similar documents, nor could Plaintiff and the Class reasonably have known the concealed information including, in particular, the undisclosed and concealed risks and infirmities of the investments until shortly before the filing of this Complaint.

153.    To this day, Defendants continue to fraudulently conceal its practices from the Class and public alike.  Defendants have refused to release or provide information about their practices in a

1  way that Plaintiff and/or the Class could have discovered its fraudulent scheme and practices.

2  Although the initial decisions to engage in these practices were made years ago, Defendants have

3  repeatedly decided since to continue concealing its fraudulent practices.

4      154.    Defendants have uniformly trained their sales force and other representatives not to

5  disclose its fraudulent practices described herein.  Defendants did not disclose its practices in any of

6  its policies or sales and marketing materials provided to Plaintiff and the Class.

7      155.    As a result of the foregoing, Plaintiff and the Class could not reasonably discover the

8  unlawful and unethical practices described herein and did not do so until no earlier than by the

9  advent of this lawsuit.  The vast majority of Class Members still do not know that they have been

10  injured by Defendants' conduct.

11      156.    Defendants' conduct is continuing in nature.  There is a substantial nexus between the

12  fraudulent conduct that has occurred within the statute of limitations and the misconduct prior to that

13  time.  The acts involve the same type of illicit practices and are recurring, continuous events.

14      157.    The statute of limitations applicable to any claims brought by Plaintiff or other Class

15  Member as a result of the conduct alleged herein has been tolled as a result of Defendants'

16  fraudulent concealment.

17  **CLASS ACTION ALLEGATIONS**

18      158.    Pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), Plaintiff bring this nationwide class

19  action on behalf of themselves and all other senior citizens (persons age 65 and older at the time of

20  purchase) who within the applicable statute of limitations of the date of the commencement of this

21  action, purchased one or more CIC deferred annuities.

22      159.    Excluded from the Class are Defendants and its directors, officers, predecessors,

23  successors, affiliates, agents, co-conspirator and employees, as well as the immediate family

24  members of such persons.

25      160.    All Class Members have suffered injury to their property by reason of Defendants'

26  scheme and unlawful course of conduct, in that they paid for insurance policies that were worth only

27  a fraction of their represented value and lost value in comparison to traditional investments such as

28

1    stock, mutual funds, bond funds, certificates of deposit and money market funds.  Class Members

2    also have suffered or could suffer substantial early withdrawal penalties.

3         161.    The Class is reasonably estimated to be in the thousands or tens of thousands and is

4    thus so numerous that joinder of all its members is impracticable.  The precise number of Class

5    Members and their addresses are unknown to Plaintiff, but can be ascertained through appropriate

6    discovery of Defendants' records.  Class Members may be notified of the pendency of this action by

7    publication and/or other notice.

8         162.    There is a well-defined community of interest in the relevant questions of law and

9    fact affecting putative class members.  Common questions of law and fact predominate over any

10   individual questions affecting class members, including, but not limited to, whether: (a) Defendants

11   uniformly omitted key risks and material information from Plaintiff and the Class; (b) Defendants

12   were aware that deferred annuities were inferior investment vehicles, particular for senior citizens;

13   (c) Defendants improperly solicited, referred, marketed, issued or sold deferred annuities to senior

14   citizens, including Plaintiff and the Class; (d) Defendants engaged in mail and/or wire fraud; (e)

15   Defendants engaged in a pattern of racketeering activity; (f) the CIC Enterprise is an "enterprise"

16   within the meaning of 18 U.S.C. §1961(4); (g) Defendants conducted or participated in the affairs of

17   the CIC Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c); (h)

18   Defendants conspired with Affiliated Agents and other unnamed co-conspirators to commit

19   violations of the racketeering laws in violation of 18 U.S.C. §1962(d); (i) Defendants committed

20   elder abuse as defined in Cal. Welf. & Inst. Code §15600 *et seq.*; (j) Defendants committed unfair,

21   unlawful and/or fraudulent business practices, in violation of Cal. Bus. & Prof. Code §17200, in its

22   marketing, promotion, solicitation, sales and issuance of deferred annuities to Plaintiff and Class

23   Members; (k) Defendants engaged in false and misleading advertising in violation of Cal. Bus. &

24   Prof. Code §17500 *et seq.*; (l) Defendants fraudulently concealed information about deferred

25   annuities from Plaintiff and the Class in violation of California law; (m) Defendants breached its

26   obligation of good faith to Plaintiff and the Class; (n) Defendants has been unjustly enriched at the

27   expense of the Class; (o) Plaintiff and the Class are entitled to damages; and (p) the Class is entitled

28   to injunctive, declaratory, and/or other relief.

163.    The claims of Plaintiff and the other Class Members have a common origin and share a common basis.  The claims originate from the same illegal, fraudulent conspiracy on the part of Defendants, Affiliated Agents, and other unnamed co-conspirators and their acts in furtherance thereof, as well as the conduct of their co-conspirators.  Plaintiff's claims are typical of those of the absent Class Members.  If brought and prosecuted individually, the claims of each Class Member would require proof of many of the same material and substantive facts, rely upon the same remedial theories and seek the same relief.

164.    Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or that directly and irrevocably conflict with the interests of other Class Members.  Plaintiff is willing and prepared to serve the Court and the putative Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiff has retained the services of counsel, identified below on the signature page, who are experienced in complex class-action litigation and in particular class actions involving insurance matters.  Plaintiff's counsel will adequately prosecute this action, and will otherwise assert, protect and fairly and adequately represent Plaintiff and all absent Class Members.

165.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the parties opposing the class.  Such incompatible standards of conduct and varying adjudications on the same essential facts, proof and legal theories would also create and allow the existence of inconsistent and incompatible rights within the Class.

166.    A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because: (a) individual claims by the Class Members would be impracticable as the costs of pursuit would far exceed what any one Class Member has at stake; (b) little individual litigation has been commenced over the controversies alleged in this Complaint, and individual class members are unlikely to have an interest in separately prosecuting and controlling individual actions; (c) the concentration of litigation of these claims in one Forum will achieve efficiency and promote judicial economy; and (d) the proposed class action is manageable.

1

**COUNT I**

2

**Violation of the Racketeer Influenced and Corrupt
Organizations Act, 18 U.S.C. Section 1962(c)**

3

4

167.    Plaintiff and the Class repeat and reallege all allegations contained in the paragraphs

above as if set forth separately in this Claim for Relief.

5

6

168.    This claim arises under 18 U.S.C. §1962(c), which provides in relevant part:

7

(c)    It shall be unlawful for any person employed by or associated with any
enterprise engaged in, or the activities of which affect, interstate or foreign
commerce, to conduct or participate, directly or indirectly, in the conduct of such
enterprise's affairs through a pattern of racketeering activity . . . .

8

9

169.    In violation of 18 U.S.C. §1962(c), Defendants have conducted or participated,

10

directly or indirectly, in the conduct of the affairs of the CIC Enterprise through a "pattern of

11

racketeering activity," as defined by 18 U.S.C. §1961(5).  Therefore, Defendants have violated 18

12

U.S.C. §1962(c).

13

170.    As a result and by reason of the foregoing, the Plaintiff and Class Members have been

14

injured, suffered irreparable harm and sustained damage to their business and property, and are

15

therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable

16

attorney fees, pursuant to 18 U.S.C. §1964(c).

17

**COUNT II**

18

**Violation of the Racketeer Influenced and Corrupt
Organizations Act, 18 U.S.C. Section 1962(d)**

19

20

171.    Plaintiff and the Class repeat and reallege all allegations contained in the paragraphs

above as if set forth separately in this Claim for Relief.

21

22

172.    This claim arises under 18 U.S.C. §1962(d), which provides in relevant part:

23

(d)    It shall be unlawful for any person to conspire to violate any of the
provisions of subsection . . . (c) of this section.

24

173.    Defendants' conspiracy to defraud the Plaintiff and other Class Members of their

25

money and property from the sale of inferior deferred annuities pursuant to the scheme described

26

above violates 18 U.S.C. §1962(d).

27

174.    As a result and by reason of the foregoing, the Plaintiff and Class Members have been

28

injured, suffered irreparable harm and sustained damage to their business and property, and are

1   therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable

2   attorney fees, pursuant to 18 U.S.C. §1964(c).

3        175.    In addition, as set forth above, Defendants have violated 18 U.S.C. §§1962(b), (c),

4   and (d), and will continue to do so in the future.  Enjoining Defendants from committing these RICO

5   violations in the future and/or declaring their invalidity is appropriate pursuant to 18 U.S.C.

6   §1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. §1962.

7 **COUNT III**

8 **Financial Elder Abuse, California Welfare
& Institutions Code Section 15600 *et seq.***

9

10        176.    Plaintiff Hansen and the Class repeat and reallege all allegations contained in the

paragraphs above as if set forth separately in this Claim for Relief.

11

12        177.    Defendants' conduct constitutes financial abuse under Cal. Welf. & Inst. Code

13   §15657.5 *et seq.*, as defined in Cal. Welf. & Inst. Code §15610.30.  California Welfare and

Institutions Code §15610.30(a) provides in relevant part:

14

15       (a)    "Financial abuse" of an elder or dependent adult occurs when a person or
             entity does any of the following:

16            (1)    Takes, secretes, appropriates, or retains real or personal property of an
                elder or dependent adult to a wrongful use or with intent to defraud, or both.

17

18            (2)    Assists in taking, secreting, appropriating, or retaining real or
                personal property of an elder or dependent adult to a wrongful use or with
                intent to defraud, or both.

19

20        178.    At all relevant times, Defendants took and/or assisted in the taking of property from

Plaintiff Hansen and the Class (who are all age 65 or older) for its own wrongful use and/or with

21

intent to defraud.  Plaintiff Hansen and the Class trusted and relied on Defendants.

22

23        179.    Defendants manipulated Plaintiff Hansen and the Class into purchasing deferred

annuities.

24

25        180.    Defendants aided and abetted the Affiliated Agents in accomplishing the wrongful

26   acts.  In doing so, Defendants acted with an awareness of its wrongdoing and realized that its

conduct would substantially assist the accomplishment of the wrongful conduct.

27

28

181.    In performing these acts, Affiliated Agents either acted as agents of Defendants, or Defendants ratified such acts, or both.

182.    Defendants' wrongful acts were done maliciously, oppressively and with the intent to mislead or defraud, thereby warranting punitive and exemplary damages or appropriate in an amount to be ascertained according to proof pursuant to Cal. Civ. Code §3294 *et seq.*

183.    Under Cal. Welf. & Inst. Code §15657.5 *et seq.*, Defendants are liable for reasonable attorneys' fees and costs for investigating and litigating this claim.

184.    Under Cal. Civ. Code §3345, Defendants are liable for treble damages and penalties because: (a) Defendants knew or should have known its conduct was directed as to a senior citizen; (b) Defendants' conduct caused a senior citizen to suffer substantial loss of property set aside for retirement, and assets essential to their health and welfare; (c) Plaintiff Hansen and the Class are senior citizens who are more vulnerable than others to Defendants' conduct because of their age, impaired understanding, impaired health or restricted mobility; and (d) Plaintiff Hansen and the Class actually suffered substantial physical, emotional and economic damages resulting from Defendants' conduct.

185.    Under Cal. Welf. & Inst. Code §15657, Defendants are liable to Plaintiff Hansen and the Class for their pain and suffering.

**COUNT IV**

**Violation of California Business &
Professions Code Section 17200 *et seq.***

186.    Plaintiff Hansen and the Class repeat and reallege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

187.    California Business and Professions Code §17200 prohibits any "unlawful . . . business act or practice."  Defendants have violated §17200's prohibition against engaging in an unlawful act or practice by, *inter alia*, the following:

(a)    violating the statutes prohibiting Defendants' conduct, as described herein, including violations of RICO, 18 U.S.C. §1962;

1     (b)  violating the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ.

2 Code §1750 *et seq.*;

3     (c)  violating Cal. Bus. & Prof. Code §17500 *et seq.*;

4     (d)  violating Cal. Ins. Code §§330-334; 762; 780; 781; 785; 787(a), (i), (k); 789.8

5 *et seq.*; 790 *et seq.*; 791.03 *et seq.*, 1861.03 *et seq.*; 10127.10; 10127.13; and 10509 *et seq.*;

6     (e)  violating Cal. Welf. & Inst. Code §§15610.30, 15656 and 15657 *et seq.*;

7     (f)  violating Cal. Civ. Code §§1689.5 *et seq.*, 1709, 1710, 1572, 1573 and 1575;

8 and

9     (g)  violating or aiding and abetting a violation of Cal. Corp. Code §§25230 and

10 25235.

11   188.  Plaintiff Hansen reserves the right to allege other violations of law which constitute

12 other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

13   189.  California Business and Professions Code §17200 also prohibits any "unfair . . .

14 business act or practice."  As detailed in the preceding paragraphs, Defendants engaged in a

15 systematic scheme to sell deferred annuities to Plaintiff and the Class, in violation of federal and

16 state law, and the fundamental policies delineated in statutory provisions.  Defendants gained the

17 trust of Plaintiff and the Class, had access to their financial information and sold them deferred

18 annuities – all the while knowing deferred annuities are inappropriate for seniors.  As a result,

19 Defendants engaged in unfair business practices prohibited by Cal. Bus. & Prof. Code §17200 *et seq.*

20   190.  California Business and Professions Code §17200 also prohibits any "fraudulent . . .

21 business act or practice."  As detailed in the preceding paragraphs, Defendants' conduct was likely to

22 deceive Plaintiff Hansen, the class and the public by, *inter alia*, representing that they were

23 providing objective financial or estate planning, and making misrepresentations and omissions about

24 the disadvantages of purchasing a deferred annuity as a senior citizen, including the steep surrender

25 charges and lengthy maturation periods that exceed the life expectancy of Plaintiff Hansen and other

26 members of the Class.

27

28

191.    Defendants aided and abetted its Affiliated Agents in accomplishing the wrongful acts. In doing so, Defendants acted with an awareness of its wrongdoing and realized that its conduct substantially assisted in the accomplishment of the wrongful conduct.

192.    As a result of Defendants' practices, Plaintiff Hansen and other Class Members have incurred financial losses, including access to needed funds, unnecessary and concealed fees, charges and penalties that they would not have otherwise incurred, expenses to hire a financial planner and/or attorney and the lost value in previous investments that they would not have otherwise incurred.

193.    Unless Defendants are enjoined from continuing to engage in the unlawful, fraudulent and unfair business practices described above, members of the general public residing within the United States, including California, will continue to be damaged.

194.    Pursuant to Cal. Bus. & Prof. Code §17203, Plaintiff Hansen seek an order requiring Defendants to immediately cease such acts of unlawful, unfair and fraudulent business practices and requiring it to return the full amount of money improperly collected – including, but not limited to, commissions and profits from the sale of annuities and income derived from penalties and fees – to all those who have paid them, plus interest and attorneys' fees.

**COUNT V**

**Violation of California Business &
Professions Code Section 17500 *et seq.***

195.    Plaintiff Hansen and the Class repeat and reallege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

196.    Defendants have intentionally issued false or misleading marketing materials and advertisements about the deferred annuity products that it sells. Defendants' uniform sales materials and standardized annuity contract forms misled and deceived Plaintiff Hansen and the Class as to the material features and key risks of its deferred annuities.

197.    Defendants have intentionally issued false or misleading advertisements soliciting seniors to attend seminars and workshops and other events for financial and estate planning, without adequately disclosing that Defendants intend to sell them insurance policies.

198.    In addition, Defendants have or should have approved all of its Affiliated Agents' advertisements and marketing materials pursuant to Cal. Ins. Code §787(l), and is, therefore, liable for such false or misleading advertisements even if it did not issue them directly.

199.    Defendants have aided and abetted the Affiliated Agents in accomplishing the wrongful acts.  In doing so, Defendants acted with awareness of its misconduct and knew that its conduct would substantially further the wrongful conduct.

200.    As a result of Defendants' misconduct as alleged herein, Plaintiff Hansen and the Class have incurred actual financial losses and damages including, but not limited to, penalties, fees, charges and deductions as a result of following the advice and recommendations of Defendants' fees and charges for the purchase of inappropriate financial products and taxes, assessments and penalties that they would not have otherwise incurred but reliance on Defendants' misrepresentations and omissions.

201.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Hansen, the Class and the general public have suffered monetary and non-monetary damages.

202.    Unless Defendants are enjoined from continuing to engage in such wrongful actions and conduct, members of the general public will continue to be damaged by Defendants' false and misleading advertising.

203.    To avoid Defendants' unjust enrichment, Defendants should be required to disgorge and to restore to Plaintiff Hansen, and members of the Class, all monies wrongfully obtained by Defendants as a result of its false and misleading advertising, along with interest.

## COUNT VI

### Breach of Fiduciary Duty

204.    Plaintiff and the Class repeat and reallege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

205.    By virtue of their purported positions as financial advisors, with access to Plaintiff's personal and confidential information, and because of their superior knowledge and ability to manipulate and control senior citizens' finances and legal status, Defendants' Affiliated Agents including IMO's and individual agents such as Mr. Zehner who marketed and sold CIC deferred

1   annuities to senior citizens assumed fiduciary duties to Plaintiff and the Class.  Defendants assumed

2   a fiduciary duty and represented that the relationship was one of *trust* and *confidence* with respect to

3   seniors' purchases of CIC's deferred annuities.

4           206.    These entities and Defendants owed to Plaintiff and members of the Class the highest

5   duties of loyalty, honesty, fidelity, trust, and due care in their fiduciary obligations, and were and are

6   required to use their utmost ability to provide estate planning and investment advice in a fair, just

7   and equitable manner, and to act in furtherance of the best interests of Plaintiff and the Class so as to

8   benefit their clients, and not themselves.

9           207.    As set forth above, Defendants and their Affiliated Agents each breached their

10  obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and

11  supervision, by *inter alia*:

12          (a)     Failing to disclose the true characteristics of the deferred annuities sold to

13  senior citizens, including the material costs, risks and potential returns related to its deferred

14  annuities;

15          (b)     Unreasonably and in bad faith refusing to give sufficient consideration to

16  Plaintiff's welfare rather than their own financial interests;

17          (c)     Churning existing senior citizen life insurance and/or annuity policyholders,

18  and using deceptive and misleading standardized marketing materials in violation of Cal. Ins. Code

19  §§781 and 10509.8;

20          (d)     Failing to competently supervise and monitor their employees;

21          (e)     Making material omissions of fact that the IMOs marketing and selling of

22  Defendants' annuities were "independent;" and

23          (f)     Maintaining an illegal marketing scheme and conspiracy in violation of

24  §1961(1)(B) of RICO to sell annuity insurance to senior citizens.

25          208.    As described herein, Defendants and their Affiliated Agents acting for or in concert

26  with Defendants, knowingly or recklessly breached their fiduciary duties by orchestrating, devising,

27  carrying out, participating in, and/or failing to prevent, terminate, or timely correct the wrongdoing

28  alleged herein.

209.   Each of these violations was achieved because Defendants willingly, knowingly, and/or recklessly sought to gain its own financial advantage to the disadvantage of Plaintiff and the Class.

210.   As a direct and proximate result of Defendants' violations of its fiduciary duties, Plaintiff and the Class have been injured, and suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

211.   In light of the foregoing, Plaintiff requests that the court deem this a constructive fraud, and require Defendants to immediately rescind the deferred annuity contracts to which Plaintiff and the Class are subject.

## COUNT VII

### Aiding and Abetting Breach of Fiduciary Duty

212.   Plaintiff and the Class repeat and reallege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

213.   Defendants and the Affiliated Agents owned, operated, and/or controlled by Defendants and acting for or on their behalf, aided and abetted, encouraged, and rendered substantial assistance to one another in order to accomplish the wrongful acts complained of herein.  In aiding and abetting and substantially assisting the commission of the acts complained of, Defendants and Affiliated Agents acted with an awareness of their wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein.  In performing these acts, each such Affiliated Agent either acted as agents of Defendants, or Defendants ratified such acts, or both, and benefited financially from their scheme.

214.   As a result of the wrongful conduct of Defendants and Affiliated Agents, Plaintiff and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

215.   In addition, the wrongful acts of Defendants and their Affiliated Agents were done maliciously, oppressively, and with the intent to mislead and defraud, and Plaintiff and the Class are entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of Defendants.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT VIII

### Fraudulent Concealment,
### Cal. Civ. Code Section 1710 *et seq.*

216.   Plaintiff Hansen and the Class repeat and reallege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

217.   Defendants intentionally misrepresented or concealed the following material information from Plaintiff Hansen and the Class:

(a)   the key risks and material features of CIC deferred annuities, including information concerning the interest crediting rate and bonus features;

(b)   the disadvantages of buying a deferred annuity, including the tax and estate consequences and penalties, and lack of access to their annuity investments within their lifetime;

(c)   the significant commissions that Affiliated Agents earn from the sale of deferred annuities to senior citizens, including Plaintiff and the Class;

(d)   the surrender charges, penalties and other fees and expenses incurred upon early withdrawal or death by obscuring and hiding references thereto; and

(e)   material information concerning its expense ratios, commissions paid and other sales charges, costs of insurance, interest rate spreads and other underwriting assumptions.

218.   Plaintiff Hansen and the Class relied on these representations and omissions, as shown by their purchase of the deferred annuities and payment of premiums and other charges and fees.

219.   Defendants performed the wrongful acts with the intent of gaining its own financial advantage to the disadvantage of Plaintiff Hansen and the Class.

220.   Defendants aided and abetted their Affiliated Agents in accomplishing the wrongful acts.  In doing so, Defendants acted with an awareness of its wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct.

221.   In performing these acts, each Affiliated Agent either acted as an agent of Defendants, Defendants ratified such acts or both.

222.    As a result of Defendants' wrongful conduct, Plaintiff Hansen and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined at trial.

223.    The wrongful acts of Defendants were done maliciously, oppressively and with the intent to mislead and defraud.  Plaintiff Hansen and the Class are entitled to punitive and exemplary damages in an amount appropriate to punish and set an example of Defendants pursuant to Cal. Civ. Code §3294 *et seq.*

**COUNT IX**

**Breach of the Duty of Good Faith and Fair Dealing**

224.    Plaintiff and the Class repeat and reallege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

225.    As alleged above, the relationship of insurer and insured exists between Defendants and Plaintiff and the other members of the Class.  The relationship of insurer and insured creates a duty, implied in law, extending from Defendants to Plaintiff and the Class to deal fairly with them and in good faith.  As a result, there is an implied obligation of good faith and fair dealing in each insurance policy.  The insurance company must not do anything to injure the right of the insured to receive the full benefits of the agreement.

226.    In addition, Defendants have a duty of honesty, good faith and fair dealing arising from Cal. Ins. Code §785(a), which provides: "All insurers, brokers, agents, and others engaged in the transaction of insurance owe a prospective insured who is 65 years of age or older, a duty of honesty, good faith, and fair dealing."

227.    To fulfill its duty of good faith and fair dealing, the insurer must give at least as much consideration to the interests of the insured as they give to its own interests. Defendants breached that duty of good faith and fair dealing in several ways, including, but not limited to:

(a)      Using deceptive and misleading marketing and sales materials, which failed to disclose sales charges, commissions paid, investment yield, underwriting assumptions and other material information about Defendants' deferred annuities;

1    (b)    using deceptive and misleading materials, which failed to adequately disclose

2  the disadvantages of buying a deferred annuity, including penalties and lack of access to their

3  annuity investments within their lifetime;

4    (c)    failing to disclose the significant commissions that Affiliated Agents earn

5  from the sale of annuities to Plaintiff and the Class;

6    (d)    obscuring and hiding references to the surrender charges, penalties and/or

7  other fees incurred upon early withdrawal;

8    (e)    drafting and using form annuity contracts that fail to properly apprise seniors

9  of required information and in the required format about the surrender period and associated

10  surrender penalties in violation of Cal. Ins. Code §10127.13;

11    (f)    failing to consider Plaintiff's and the Class' welfare above its own;

12    (g)    failing to comply with state law, industry standards and/or internal policies

13  and by selling deferred annuities to seniors after issuing without performing full and complete

14  investigations as to appropriateness of the annuities sold to Plaintiff;

15    (h)    unfairly and deceptively making discretionary rate changes to strengthen its

16  weakened financial condition at the expense of purchasers and owners of its annuities and thereby

17  decimating returns on investment; and

18    (i)    failing to competently train and supervise their Affiliated Agents and/or

19  employees.

20    228.    As a proximate result of the aforementioned acts and omissions of Defendants,

21  Plaintiff and the Class have suffered damages in a sum to be proven at the time of trial.  It has also

22  become necessary for Plaintiff to retain counsel to recover amounts due under the contracts.

23    229.    The aforementioned acts were performed maliciously, fraudulently and oppressively,

24  thereby entitling Plaintiff and the Class Members to punitive damages in an amount appropriate to

25  punish Defendants.

26

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - C-05-04726-RMW And Related Cases

**COUNT X**

**Unjust Enrichment and Imposition of Constructive Trust**

230.    Plaintiff and the Class repeat and reallege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

231.    Defendants owed various duties to Plaintiff and the Class as a result of their insurer/insured relationship and/or duty of good faith and fair dealing.

232.    By engaging in the elder deferred annuity scheme, Defendants extracted payments from Plaintiff and Class Members, including, but not limited to, annuity premiums, commissions, service charges, surrender charges and other fees, expenses and charges based upon misleading and fraudulent uniform sales presentations, marketing materials and annuity illustrations.

233.    As a result of the relationships between and among the parties and the facts stated above, Defendants will be unjustly enriched if they are permitted to retain such funds; therefore, a constructive trust should be established over the monies that Plaintiff and the Class Members paid to Defendants.  These monies are traceable to Defendants.

234.    The victims of the unsuitable deferred annuity sales scheme described above have no adequate remedy at law and have been damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and the Class, prays for judgment against Defendants as follows:

A.    For a temporary, preliminary and permanent order for injunctive relief enjoining Defendants from pursuing the practices complained of above;

B.    For a temporary, preliminary and permanent order for injunctive relief requiring Defendants to undertake an immediate public information campaign to inform members of the general public as to its prior practices and notifying the members of the putative Class of the potential for restitutionary relief;

C.    For an order requiring disgorgement and restitution of Defendants' ill-gotten gains and payment of restitution to Plaintiff and the Class all funds acquired by means of any practice declared by this Court to be unlawful, fraudulent or unfair;

1    D.    An order certifying the Class as defined herein;

2    E.    Distribution of any monies recovered on behalf of Plaintiff or the Class, via fluid

3    recovery or *cy pres* recovery where necessary to prevent Defendants from retaining any of the profits

4    or benefits of their wrongful conduct;

5    F.    Imposition of a constructive trust;

6    G.    For reasonable attorneys' fees and costs of investigation and litigation under 18

7    U.S.C. §1964(c); and the common fund doctrine;

8    H.    For compensatory, special and general damages according to proof;

9    I.    For punitive and exemplary damages under Cal. Welf. & Inst. Code §15657(a) and

10   Cal. Civ. Code §3294;

11   J.    For treble damages and penalties pursuant to 18 U.S.C. §1964(c); Cal. Civ. Code

12   §3345; Cal. Bus. & Prof. Code §§6153, 6175.4, 6175.5 and 17206.1; and Cal. Ins. Code §789;

13   K.    For double damages under Cal. Prob. Code §859;

14   L.    For transfer of the wrongfully obtained monies and/or property under Cal. Prob. Code

15   §§850-859 *et seq.*;

16   M.    For costs of suit, pre-judgment and post-judgment interest; and

17   N.    Such other and further relief as the interests of law or equity may require.

18                              **JURY DEMAND**

19   Plaintiff demands a trial by jury.

20   DATED:  April 27, 2007                    LERACH COUGHLIN STOIA GELLER
                                               RUDMAN & ROBBINS LLP
21                                             JOHN J. STOIA, JR.
                                               THEODORE J. PINTAR
22                                             PHONG L. TRAN
                                               RACHEL L. JENSEN
23                                             STEVEN M. JODLOWSKI

24

25                                            /s  JOHN J. STOIA, JR.
                                               JOHN J. STOIA, JR.

26
                                               655 West Broadway, Suite 1900
27                                             San Diego, CA  92101
                                               Telephone:  619/231-1058
28                                             619/231-7423 (fax)

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - C-05-04726-RMW And Related Cases    - 64 -

1

BARRACK, RODOS & BACINE
STEPHEN R. BASSER

2

MARK R. ROSEN
JOHN L. HAEUSSLER

3

4

_____/s  STEPHEN R. BASSER_____

5

STEPHEN R. BASSER

6

402 West Broadway, Suite 850
San Diego, CA  92101

7

Telephone:  619/230-0800
619/230-1874 (fax)

8

9

Co-Lead Counsel for Plaintiffs

BONNETT, FAIRBOURN, FRIEDMAN

10

  & BALINT, P.C.
ANDREW S. FRIEDMAN

11

KIMBERLY C. PAGE
MICHAEL C. McKAY

12

2901 N. Central Avenue, Suite 1000
Phoenix, AZ  85012

13

Telephone:  602/274-1100
602/274-1199 (fax)

14

15

FINKELSTEIN & KRINSK LLP
HOWARD D. FINKELSTEIN
MARK L. KNUTSON

16

501 West Broadway, Suite 1250
San Diego, CA 92101

17

Telephone:  619/238-1333
619/238-5425 (fax)

18

19

RENNE SLOAN HOLTZMAN & SAKAI, LLP
LOUISE H. RENNE
INGRID M. EVANS

20

350 Sansome Street, Suite 300
San Francisco, CA  94101

21

Telephone:  415/678-3800
415/678-3838 (fax)

22

23

JAMES, HOYER, NEWCOMER
  & SMILJANICH, P.A.
CHRISTA L. COLLINS

24

JOHN YANCHUNIS
J. ANDREW MEYER

25

4830 West Kennedy Blvd.
Urban Centre One, Suite 550

26

Tampa, FL  33609
Telephone:  813/286-4100

27

813/286-4174 (fax)

28

1

2         LAW OFFICES OF MICHAEL D. THAMER
         MICHAEL D. THAMER

3         1244 South Highway 3
         P.O. Box 1568

4         Callahan, CA 96014
         Telephone:  530/467-5307

5         SHERNOFF, BIDART & DARRAS
         WILLIAM SHERNOFF

6         EVANGELINE F. GARRIS
         600 South Indian Hill Blvd.

7         Claremont, CA  91711
         Telephone:  909/621-4936

8         909/625-6915 (fax)

9         Additional Counsel for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  S:\CasesSD\Conseco Annuity\CPT 00041413.doc

1

<u>CERTIFICATE OF SERVICE</u>

2

  I hereby certify that on April 27, 2007, I electronically filed the foregoing with the Clerk of

3

the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6

participants indicated on the attached Manual Notice List.

7

8

       /s/ John J. Stoia, Jr.
        JOHN J. STOIA, JR.

9

      LERACH COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP

10

      655 West Broadway, Suite 1900
      San Diego, CA  92101

11

      Telephone:  619/231-1058
      619/231-7423 (fax)

12

      E-mail: johns@lerachlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

S:\CasesSD\Conseco Annuity\CPT 00041413.doc

# Mailing Information for a Case 5:05-cv-04726-RMW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Stephen R. Basser**
  sbasser@barrack.com gdiaz@barrack.com;jhaeussler@barrack.com;mgades@barrack.com

- **Thomas A. Doyle**
  Thomas.A.Doyle@bakernet.com

- **James J Dries**
  James.J.Dries@bakernet.com

- **Ingrid M. Evans**
  ievans@publiclawgroup.com rredmayne@publiclawgroup.com

- **Howard D. Finkelstein**
  fk@classactionlaw.com

- **Andrew S. Friedman**
  afriedman@bffb.com rcreech@bffb.com

- **Heather B. Hoesterey**
  hhoesterey@reedsmith.com nmedina@reedsmith.com

- **Rachel Lynn Jensen**
  rachelj@lerachlaw.com e_file_sd@lerachlaw.com

- **Steven M. Jodlowski**
  sjodlowski@lerachlaw.com

- **Mark L Karasik**
  Mark.L.Karasik@bakernet.com

- **Linda B. Oliver**
  LOliver@ReedSmith.com SWurth@ReedSmith.com;cfoundation@reedsmith.com

- **Robert D. Phillips, Jr**
  RPhillips@ReedSmith.com Lvieland@ReedSmith.com

- **Theodore Joseph Pintar**
  TedP@lerachlaw.com CHaney@lerachlaw.com

- **John J. Stoia, Jr**
  jstoia@lerachlaw.com

- **Phong L. Tran**
  ptran@lerachlaw.com csindac@lerachlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore

Case 5:05-cv-04726-RMW   Document 86   Filed 04/27/07   Page 70 of 70

require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Elaine A. Ryan**
Bonnett Fairbourn Friedman & Balint, P.C
2901 N. Central Avenue
Suite 1000
Phoenix, AZ 85012

**Patricia N. Syverson**
Bonnett, Fairbourn, Friedman & Balint, P.C.
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012

**Michael D Thamer**
Law Offices of Michael D.Thamer
12444 South Highway 3
Post Office Box 1568
Callahan, CA 96014-1568